## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER<br>1718 Connecticut Avenue, N.W., Suite 200<br>Washington, D.C. 20009,<br><br>     Plaintiff,<br><br>     v.<br><br>U.S. NATIONAL ARCHIVES AND RECORDS<br>ADMINISTRATION,<br>700 Pennsylvania Avenue N.W.,<br>Washington, D.C. 20408<br><br>     Defendant. | Civ. Action No.  18-2150 |

### COMPLAINT FOR INJUNCTIVE RELIEF

1.     This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to compel disclosure of records requested by Plaintiff Electronic Privacy Information Center ("EPIC") from the National Archives and Records Administration ("NARA").

2.     EPIC seeks the release of records in the possession of NARA about Brett M. Kavanaugh's work in the White House between September 1, 2001 and May 31, 2006. Following the nomination of Judge Kavanaugh to the Supreme Court, EPIC submitted two FOIA requests to the George W. Bush Presidential Library and Museum, a NARA subcomponent, on August 1, 2018, seeking the release of records that could help inform the public debate ("EPIC's Kavanaugh E-mails FOIA Request" and "EPIC's Kavanaugh Staff Files FOIA Request"). In this Complaint, EPIC challenges (1) NARA's failure to make a timely decision about EPIC's two FOIA requests; and (2) NARA's failure to release records responsive to EPIC's two FOIA requests. EPIC seeks injunctive and other appropriate relief.

**Jurisdiction and Venue**

3.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 5

U.S.C. §§ 552(a)(6)(E)(iii), (a)(4)(B). This Court has personal jurisdiction over Defendant

NARA.

4.      Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B).

**Parties**

5.      Plaintiff EPIC is a nonprofit organization, incorporated in Washington, D.C.  EPIC was

established in 1994 to focus public attention on emerging privacy and civil liberties issues.

Central to EPIC's mission is education, oversight, and analysis of government activities that

impact individual privacy, free expression, and democratic values in the information age.[1]

EPIC's Advisory Board includes distinguished experts in law, technology, and public policy.

6.      EPIC maintains one of the most popular privacy websites in the world, https://epic.org,

which provides EPIC's members and the public with access to information about emerging

privacy and civil liberties issues. EPIC has a robust FOIA practice and routinely disseminates

information obtained under the FOIA to the public through the EPIC website, the biweekly *EPIC

Alert* newsletter, and various news organizations. EPIC is a representative of the news media.

*EPIC v. Dep't of Def.*, 241 F. Supp. 2d 5, 15 (D.D.C. 2003).

7.      EPIC routinely submits statements to the Senate Judiciary Committee regarding the

qualifications of nominees to the Supreme Court based on their prior judicial opinions, published

articles, and views espoused during their service in government.

8.      Defendant NARA is a federal agency within the meaning of the FOIA, 5 U.S.C. §

552(f)(1). NARA is headquartered in College Park, M.D.

---

[1] *See* EPIC, *About EPIC* (2018), https://epic.org/epic/about.html**.**

## Facts

9.      On July 9, 2018, President Trump nominated Judge Brett M. Kavanaugh to the U.S.

Supreme Court.[2]

10.      Prior to his confirmation to the D.C. Circuit Court of Appeals by the United States Senate

on May 27, 2006, Judge Kavanaugh served in the White House in the George W. Bush

administration.[3] From January 2001 to July 2003 Judge Kavanaugh served as an Associate

Counsel and then as a Senior Associate Counsel. From July 2003 to May 2006 he served as

Assistant to the President and then as Staff Secretary.[4]

11.      As White House Counsel, Brett Kavanaugh provided advice to the President regarding

important legal matters, including the purpose and effects of the Patriot Act.

12.      As Staff Secretary, Brett Kavanaugh played a key role in controlling the flow of

documents in and out of the Oval Office and circulating documents to senior administration

officials for comment, several of whom were involved in the warrantless wiretapping program

that was later suspended by Congress.

13.      Many of the post-September 11th surveillance systems, directed toward the American

public, were initiated and implemented during Brett Kavanaugh's period as Associate Counsel

and then Staff Secretary to President George W. Bush, including the President's warrantless

---

[2] *President Donald J. Trump Announces Intent to Nominate Judge Brett M. Kavanaugh to the Supreme Court of the United States*, White House (July 9, 2018), https://www.whitehouse.gov/presidential-actions/president-donald-j-trump-announces-intent-nominate-judge-brett-m-kavanaugh-supreme-court-united-states/.
[3] *Id.*
[4] *Brett M. Kavanaugh*, District of Columbia Circuit, U.S. Court of Appeals, https://www.cadc.uscourts.gov/internet/home.nsf/Content/VL+-+Judges+-+BMK.

wiretapping program, Total Information Awareness, airport body scanners,[5] passenger profiling,[6] and the passage of the PATRIOT Act[7] and the REAL ID provisions.[8]

14.     Many of these programs were subject to high-profile public scrutiny, including intense media coverage, and would likely have been reviewed within the White House.

<u>The Creation of the Warrantless Surveillance Program</u>

15.     On September 17, 2001, Brett Kavanaugh wrote to John Yoo, the Justice Department attorney who drafted the legal opinion that provided the basis for the warrantless wiretapping program (and was subsequently rescinded by the Department of Justice). In the message, Kavanaugh inquired about authority for warrantless surveillance: "Any results yet on the 4A implications of random/constant surveillance of phone and e-mail conversations of non-citizens who are in the United States when the purpose of the surveillance is to prevent terrorist/criminal violence?"[9]

16.     In a memorandum dated the same day—September 17, 2001—John Yoo prepared a memorandum concerning "Constitutional Standards on Random Electronic Surveillance for Counter-Terrorism Purposes."[10]

---

[5] EPIC, *Whole Body Imaging Technology and Body Scanners ("Backscatter" X-Ray and Millimeter Wave Screening)* (2018), https://epic.org/privacy/airtravel/backscatter/.

[6] EPIC, *Passenger Profiling* (2017), https://www.epic.org/privacy/airtravel/profiling.html.

[7] *See* EPIC, *USA PATRIOT Act* (2015), https://www.epic.org/privacy/terrorism/usapatriot/.

[8] *See* EPIC, *National ID and the REAL ID Act* (2017), https://www.epic.org/privacy/id_cards/.

[9] E-mail from Brett Kavanaugh, Assoc. Counsel, White House to John Yoo, Dep't of Justice (Sep. 17, 2001), https://int.nyt.com/data/documenthelper/264-purported-kavanaugh-e-mail-to/702e332fddd3bf0416f3/optimized/full.pdf#page=1.

[10] Office of the Inspector Gen., U.S. Dep't of Justice, A Review of the Dep't of Justice's Involvement with the President's Surveillance Program 13 (July 2009), *available at* https://ia600305.us.archive.org/17/items/Report-President-Surveillance-Program-2009/Report-President-Surveillance-Program-2009.pdf.

17.     President Bush "issued the first of 43 Presidential Authorizations" for a warrantless

wiretapping program called "Stellar Wind" on October 4, 2001.[11] That program had three

components: first, it authorized the National Security Agency ("NSA") to intercept the contents

of private communications (including purely domestic communications) without a warrant,

second, it authorized the acquisition of "telephony meta data" where "one end of the

communication was foreign and neither communicant was known to be a U.S. citizen," and third,

it authorized the collection of "e-mail meta data" where "one end of the communication was

foreign and neither communicant was known to be a U.S. citizen."[12]

18.     President Bush's authorization for Stellar Wind involved key officials in the

Administration:

- Vice President Richard B. Cheney,

- White House Counsel Alberto R. Gonzalez,

- Chief of Staff to the President Andrew H. Card,

- Counsel to the Vice President David S. Addington,

- NSA Director Michael V. Hayden,

- Attorney General John D. Ashcroft,

- Deputy Assistant Attorney General John Yoo,

- Directors of Central Intelligence George J. Tenet, and

- DOJ Counsel for Intelligence Policy James Baker,[13]

19.     During this period, Brett Kavanaugh worked directly for White House Counsel Alberto

Gonazales as Associate Counsel.

---

[11] *Id.* at 28.
[12] *Id*. at 29.
[13] *Id*. at 30.

20.     Subsequent emails regarding this program between Brett Kavanaugh and John Yoo have not been released to the public.

21.     Email communications regarding this program between Brett Kavanaugh White House Counsel Alberto Gonzalez and have not been released to the public.

22.     Prior to the President's authorization of Stellar Wind, Director Hayden on September 14, 2001 authorized NSA officials to target certain foreign numbers for surveillance to facilitate "dialing analysis/contact chaining."[14] Director Hayden then informed CIA Director Tenet of this expansion of surveillance authority, and Director Tenet then explained the expansion to Vice President Cheney "during a meeting at the White House."[15] Director Hayden then met several times with Vice President Cheney and his Counsel David Addington to discuss further expanding surveillance authorities.[16]

23.     According to Hayden, it was Addington who drafted the first version of the Stellar Wind authorization.[17] President Bush signed 43 related authorizations between October 4, 2001, and December 8, 2006.[18] The CIA prepared "threat assessment memorandums" related to the President's authorizations between October 2001 and May 2003.[19] These memorandums were coordinated by the CIA Director's Chief of Staff John H. Moseman and reviewed by CIA Acting General Counsel John A. Rizzo.[20]

24.     No emails between Brett Kavanaugh and his superior officer Alberto Gonzalez, or any of the other senior administration, associated with Stellar Wind have been released to the public.

---

[14] *Id.* at 5.
[15] *Id.*
[16] *Id.* at 7.
[17] *Id.*
[18] *Id.*
[19] *Id.* at 10.
[20] *Id.* at 10–11.

25.     Brett Kavanaugh also held the positions of Assistant and Staff Secretary to the President during the period from 2003 to 2004 when Department of Justice officials raised concerns about the legality of the program.

26.     John Yoo resigned from the DOJ in May 2003 and was replaced by Patrick Philbin, who was read in to the program to assume Yoo's role (at that time Attorney General Ashcroft was the only other DOJ official read in to the program). After Philbin reviewed Yoo's prior memoranda, he discovered that "Yoo had omitted from his analysis any reference to the FISA provision" that restricted warrantless interceptions and he began, at Ashcroft's direction drafting a memorandum to assess the legality of the program.[21] Then on October 6, 2003, Jack Goldsmith was sworn in as Assistant Attorney General for OLC and Philbin convinced Addington that he be read in to the program.[22] Goldsmith agreed with Philbin's concerns about the legality of the program and subsequently wrote a memorandum on May 6, 2004, reassessing its legality.[23]

27.     During the period from December 2003 to May 2004, Goldsmith and Philbin met with Addington and Gonzales numerous times to discuss the legal problems they had identified; they also requested that Deputy Attorney General James B. Comey be read in to the program.[24]

28.     Deputy Attorney General Comey raised concerns about the legality of the program with Attorney General Ashcroft on March 4, 2004.[25] Soon after that meeting, Ashcroft fell ill and was hospitalized. With the program set to expire on March 11, White House officials reached an

---

[21] *Id.* at 36–37.
[22] *Id.*
[23] *Id.* at 38. *See also* EPIC, *EPIC v. DOJ – Warrantless Wiretapping Program* (2018), https://epic.org/privacy/nsa/foia/#foia (linking to a copy of the Goldsmith memorandum obtained by EPIC under the FOIA).
[24] Office of the Inspector Gen., U.S. Dep't of Justice, A Review of the Dep't of Justice's Involvement with the President's Surveillance Program 39 (July 2009).
[25] *Id.* at 40.

impasse because Comey, Goldsmith, and Philbin refused to sign off on the program; this precipitated the dramatic scene at Ashcroft's hospital bed on March 10, 2004.[26]

29.    Brett Kavanaugh was Assistant and Staff Secretary to the President during the period that the warrantless wiretapping program was launched, he outlined the contours of the program in an email to John Yoo who became the architect of the program, he worked directly for the White House counsel who was central to the program, numerous concerns were raised by White House officials about the program, yet none of Brett Kavanaugh's e-mails or records concerning these events have been made public.

<u>The Defense of the Warrantless Wiretapping Program</u>

30.    The warrantless wiretapping program was carried out in secret, without judicial oversight, until the publication of a New York Times article in December 16, 2005,[27] and subsequent hearings in Congress led to the end of the program.[28]

31.    The New York Times was aware of the program in 2004, but White House officials convinced the paper to delay publication, and conceal the facts of the program from the American public, for more than a year.[29]

---

[26] *See id.* at 40–44.

[27] James Risen & Eric Lichtblau, *Bush Let U.S. Spy on Callers Without Courts*, N.Y. Times (Dec. 16, 2005), https://www.nytimes.com/2005/12/16/politics/bush-lets-us-spy-on-callers-without-courts.html. EPIC was also the first organization to file a FOIA request for the release of documents concerning the warrantless wiretapping program, once the story appeared. *See* EPIC, *EPIC v. DOJ – Warrantless Wiretapping Program*, https://epic.org/privacy/nsa/foia/.

[28] *Oversight of the US Department of Justice: Hearing Before the S. Comm. on the Judiciary*, 110th Cong. (2007), *available at* https://www.c-span.org/video/?196247-1/justice-department-oversight (C-SPAN); *See also,* David Stout, *Gonzales Testifies on Eavesdropping Change*, N.Y. Times (Jan. 18, 2007), https://www.nytimes.com/2007/01/18/washington/18cnd-justice.html.

[29] James Risen, *The Biggest Secret*, The Intercept (Jan. 3, 2018), https://theintercept.com/2018/01/03/my-life-as-a-new-york-times-reporter-in-the-shadow-of-the-war-on-terror/. *See also*, Paul Fahri, *At the Times, a Scoop Deferred*, Wash. Post (Dec. 17, 2005) ("the Times said in its story that it held off publishing the 3,600-word article for a year after the

32.     During Brett Kavanaugh's 2006 confirmation hearing before the Senate Committee on

the Judiciary, Senator Leahy asked Brett Kavanaugh, "Did you see documents relating to the

President's NSA warrantless wiretapping program?" Brett Kavanaugh responded that he

"learned of … reports of that program when there was a New York Times story that came over

the wire" in December 2005. Senator Leahy continued, "You had not seen anything, or had you

heard anything about it prior to the New York Times article?" Brett Kavanaugh replied, "No."

Senator Leahy asked again, "Nothing at all?" Brett Kavanaugh replied, "Nothing at all." Later in

the hearing, Senator Leahy asked again, "Did you see documents of the President relating to the

NSA's warrantless wiretapping program?" Judge Kavanaugh responded, "No."[30]

33.     In 2006, following the nomination hearing, Brett Kavanaugh was asked about his

involvement in a program that "authorized the National Security Agency (NSA) to eavesdrop on

Americans in the United States without court approval" that was subject to review every 45 days

by Counsel to the President. Brett Kavanaugh was reminded that during the period of the

program, authorized first in 2002, he had served as Associate Counsel to the President, Senior

Counsel to the President, and Assistant to the President and Staff Secretary. Brett Kavanaugh

stated, "I had no involvement in meetings, briefings, or other discussions in shaping the program

or the legal justifications for the program. Since December 16, 2005, the President has spoken

publicly about the program on numerous occasions and I have performed my ordinary role as

Staff Secretary with respect to staffing the President's public speeches."[31]

---

newspaper's representatives met with White House officials."),
http://www.washingtonpost.com/wp-dyn/content/article/2005/12/16/AR2005121601716.html.
[30] *Confirmation Hearing on the Nomination of Brett Kavanaugh to be Circuit Judge for the District of Columbia Circuit: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 42-43; 49 (2006), https://www.gpo.gov/fdsys/pkg/CHRG-109shrg27916/pdf/CHRG-109shrg27916.pdf.
[31] Nat'l Archives & Records Admin., 08-29-18 NARA Nomination File Production 181-82 (2018).

34.     According to a Pulitzer Prize-winning book that recounted the days in December 2005

after the warrantless wiretapping story became public, Kavanaugh was a key member of the

White House team that defended the program. "'It is not good,' Kavanaugh wrote, 'if Americans

or Members of Congress think we did something that is a good thing but stretched the law in

doing . . . we need to fight back hard on the legal part in the court of public opinion and the court

of Congress.'"[32]

35.     The Lichtblau account contradicts Kavanaugh's 2006 testimony.

36.     Brett Kavanaugh's e-mails and records related to his defense of the warrantless

wiretapping program and the White House's response to the *New York Times* story have not been

made available to the public.

The Defense and Expansion of the Patriot Act

37.     Brett Kavanaugh played a central role in the adoption of the Patriot Act, which he

described as a "measured, careful, responsible, and constitutional approach."[33]

38.     Brett Kavanaugh drafted talking points in support of the Patriot Act that were later

incorporated into President Bush's signing statement.[34] Brett Kavanaugh wrote, "the new law

will update laws authorizing government surveillance. These laws were enacted decades ago by

Congress in an era of rotary telephones. These laws must be updated to account for email,

internet usage, cellular phones, and other forms of modern communication."[35] President Bush

adopted the "rotary phones" characterization in his signing statement, stating "The existing law

---

[32] Eric Lichtblau, Bush's Law: The Remaking of American Justice 225 (2009).
[33] E-mail from Brett Kavanaugh, Assoc. Counsel, White House to Edmund A. Walsh,
Speechwriter, White House 689 (Oct. 24, 2001),
https://www.judiciary.senate.gov/imo/media/doc/08-02-
18%20GWB%20Document%20Production%20-%20Pages%201%20-%205,735.pdf.
[34] *Id.* at 688-90.
[35] *Id*. At 689.

was written in the era of rotary telephones. This new law that I sign today will allow surveillance of all communications used by terrorists, including e-mails, the Internet, and cell phones."[36]

39.     Brett Kavanaugh's description of the Patriot Act revealed a deep misunderstanding of modern privacy law, or an attempt to mislead. The Patriot Act diminished privacy protections in the Cable Act, 47 U.S.C. § 551, and the Electronic Communications Privacy Act ("ECPA", 18 U.S.C. § 2701 et seq., neither of which were from "the era of the rotary phone," as Brett Kavanaugh wrote.[37] The Cable Act protected the privacy of interactive video records. The EPCA protected email.

40.     Brett Kavanaugh was Assistant to the President and Staff Secretary prior to passage of the USA PATRIOT Act Additional Reauthorizing Amendments Act of 2006, Pub. L. 109-178, 120 Stat. 278 (Mar. 9, 2006), which further expanded surveillance authorities.

41.     Brett Kavanaugh was Assistant to the President and Staff Secretary during the transition of the "telephony metadata program" to the bulk surveillance orders issued under Section 215 of the PATRIOT Act. The first Section 215 order for bulk telephony metadata was issued on May 24, 2006.[38]

---

[36] George W. Bush, *Remarks on Signing the USA PATRIOT ACT of 2001* (Oct. 26, 2001), http://www.presidency.ucsb.edu/ws/?pid=63850.

[37] E-mail from Brett Kavanaugh, Assoc. Counsel, White House to Edmund A. Walsh, Speechwriter, White House 689 (Oct. 24, 2001), https://www.judiciary.senate.gov/imo/media/doc/08-02-18%20GWB%20Document%20Production%20-%20Pages%201%20-%205,735.pdf.

[38] *In re Application of the Federal Bureau of Investigation for an order Requiring the Production of Tangible Things from [Redacted]*, No. BR 06-05 (FISA Ct. 2006), *available at* https://www.dni.gov/files/documents/section/pub_May%2024%202006%20Order%20from%20 FISC.pdf; *see also* David S. Kris, *On the Bulk Collection of Tangible Things*, 7 J. Nat'l Security Law & Pol'y 209, 213 (2014); Nat'l Sec. Agency, Off. Of the Inspector Gen., Working Draft ST-09-0002, at 39 (2009) [hereinafter NSA IG Working Draft Report], available at https://www.documentcloud.org/documents/718895-igreport.html.

42.     According to an NSA Inspector General's report, the publication of the *New York Times*

story in December of 2005 lead to the transition of the telephony metadata program to Section

215 because one of the participating telephone providers "expressed concern about providing

telephony metadata to the NSA under Presidential authority without being compelled."[39]

43.     After the Section 215 program was revealed to the public on June 6, 2013, it was harshly

criticized by Members of Congress. The Privacy and Civil Liberties Oversight Board concluded

in its review of the program that it had "not identified a single instance involving a threat to the

United States in which the program made a concrete difference in the outcome of a

counterterrorism investigation."[40] Senator Leahy further emphasized after the report was released

that "the administration has not demonstrated that the Section 215 phone records collection

program is uniquely valuable enough to justify the massive intrusion on Americans' privacy."[41]

44.     Congress subsequently passed the USA FREEDOM Act in 2015 ending the bulk

collection program and amending Section 215.[42]

45.     Emails concerning Brett Kavanaugh's possible role in the secret expansion of the

PATRIOT Act and the expansion of the Section 215 program involving bulk collection of

telephone records of Americans, have not been made available to the public.

---

[39] NSA IG Working Draft Report, *supra*, at 39.
[40] Privacy & Civil Liberties Oversight Board, *Report on the Telephone Records Program Conducted under Section 215*
*of the USA PATRIOT Act and on the Operations of the Foreign Intelligence Surveillance Court* 11 (Jan. 23, 2014), *available at* https://www.pclob.gov/library/215-Report_on_the_Telephone_Records_Program.pdf.
[41] *The Report of the Privacy and Civil Liberties Oversight Board on Reforms to the Section 215 Telephone Records Program and the Foreign Intelligence Surveillance Court: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. (2014) (statement of Sen. Leahy), *available at* https://www.judiciary.senate.gov/imo/media/doc/7-31-13LeahyStatement.pdf.
[42] Pub. L. 114-23, 129 Stat. 268 (June 2, 2015).

Opinion in *Klayman v. Obama*

46.     Judge Kavanaugh defended warrantless surveillance in a surprising concurring opinion in

*Klayman v. Obama*, 805 F.3d 1148 (D.C. Cir. 2015) (petition for a denial of a rehearing en

banc). Judge Kavanaugh stated that the "bulk collection of telephony data" is not a search and is

"entirely consistent with the Fourth Amendment."[43] He stated further that if it was a search, the

search would be reasonable because the collection of the personal data serves "a special need."[44]

No court had ever recognized the "special needs" doctrine without a showing that the conduct in

fact advances a governmental interest.

Testimony Before the Senate Judiciary Committee in 2018

47.     In testimony before the Senate Judiciary Committee on September 6, 2018, Judge

Kavanaugh acknowledged that *Carpenter v. United States* was a "game changer," but he failed to

justify or revise his assertion of the special needs doctrine in the face of clear evidence that the

warrantless surveillance program he defended did not prevent any terrorist acts.[45]

48.     On September 10, 2018, Senator Durbin asked Judge Kavanaugh in writing to "describe

the full extent of your involvement in questions about warrantless surveillance of American

while you were working in the White House." Judge Kavanaugh responded, "As I explained in

the hearing, in the wake of September 11th, it was 'all hands on deck' in the White House and in

the White House Counsel's Office. While I do not have specific recollections, I cannot rule out

having discussed warrantless surveillance generally in the wake of the attacks. I believe everyone

was discussing actions to protect America from attack. As I further explained during the hearing,

---

[43] *Klayman v. Obama,* 805 F.3d 1148, 1148-49 (2015).
[44] *Id*.
[45] C-SPAN, *Senator Leahy Pursues Questions about Privacy with Judge Kavanaugh* (Sep. 6, 2018), https://www.c-span.org/video/?c4748241/senator-leahy-pursues-questions-privacy-judge-kavanaugh.

my testimony in 2006 was accurate regarding the fact that I did not know about the Terrorist

Surveillance Program, or TSP, until it became public in December 2005."[46]

49.     Related emails have been withheld form the American public.

50.     On September 10, 2018, Senator Leahy asked Judge Kavanaugh in writing whether he

was aware of the memorandum John You sent to Timothy Flanigan on September 17, 2001.

Judge Kavanaugh said, "I cannot specifically recall every memorandum that I may have seen

while working for the White House Counsel's Office." In response to Senator Leahy's question

of whether he had "any conversations of any type via email, over the phone, in person or

otherwise" with John You between September 17, 2001, and October 4, 2001 "regarding

warrantless surveillance of phone and/or email conversations within the United States," Judge

Kavanaugh responded, "I cannot specifically recall every conversation that I may have had while

working for the White House Counsel's Office."[47]

51.     Related emails have been withheld form the American public.

52.     Only 7% of the records from Judge Kavanaugh's time as Counsel and Staff Secretary at

the White House had been disclosed to the Committee on the Judiciary, and only 4% been

disclosed to the public.[48]

53.     E-mails and staff files from Judge Kavanaugh's employment in the White House would

provide more information about his role in the secret expansion of the Patriot Act, which was

curtailed by the Freedom Act, and the warrantless wiretapping program, which was later

suspended.

---

[46] *Id.* at 90.
[47] *Id.* at 53–54.
[48] *Why Brett Kavanaugh's hearing is flawed: Today's Talker*, USA Today (Sep. 5, 2018 3:22PM), https://www.usatoday.com/story/opinion/2018/09/05/brett-kavanaughs-hearing-flawed-release-records-talker/1201831002/.

54.     Documents from the Office of the Staff Secretary are held by NARA, which houses these records in the respective presidential libraries. The George W. Bush Presidential Library and Museum maintains records related to Judge Kavanaugh's service during the George W. Bush Administration. In particular, the Library holds textual records from the White House Counsel's Office and the White House Office of the Staff Secretary.[49]

55.     The public has an exceptional interest in knowing the extent to which Judge Kavanaugh was involved in the secret expansion of the Patriot Act and the warrantless surveillance program, and whether he has lied to or misled the Senate about his involvement in sworn testimony. He will receive a life-time appointment to the highest judicial office in the United States and will be given the opportunity to shape the right of privacy in America for a generation to come.

56.     The secrecy surrounding this nomination is unprecedented. EPIC's two FOIA requests may provide the only opportunity for the Senate, and the public, to fully assess the qualifications of Judge Brett Kavanaugh to serve on the United States Supreme Court.

57.     The release of documents in this particular matter will only be meaningful if it occurs prior to the votes on the nominee, which are expected to take place this week in the Senate Judiciary Committee, and later this month before the full Senate.

58.     It is the central purpose of the Freedom of Information Act that the American public should be able to obtain information about the activities of the United States government, including those records, emails, memos, and communications, that government officials would otherwise choose to withhold.

---

[49] *See* George W. Bush Presidential Library and Museum, *George W. Bush Presidential Library – Collections Guide to Open Records* (2018), https://www.georgewbushlibrary.smu.edu/Research/Finding-Aids/~/media/40CC3E16C0454A80B995B7F9EBDD61B5.ashx.

**EPIC's FOIA Requests**

59.     On July 30, 2018, EPIC submitted two FOIA requests ("EPIC's Kavanaugh E-mails

FOIA Request" and "EPIC's Kavanaugh Staff Files FOIA Request) to NARA via e-mail.

60.     EPIC's Kavanaugh E-mails FOIA Request sought records of e-mails to and from Brett

M. Kavanaugh concerning various proposals for surveillance of the American public during his

time at the White House as Associate Counsel and Senior Associate Counsel in 2001-2003 and

Staff Secretary in 2003-2006. Specifically, EPIC sought:

1) All e-mails sent to or from Brett Kavanaugh on the following dates:
   - March 1–10, 2004
   - October 1 – December 31, 2004
   - December 1–31, 2005
2) All e-mails sent to or from Brett Kavanaugh between September 1, 2001, and
   May 31, 2006, containing any of these phrases:
   - "President's Surveillance Program" or PSP
   - "Terrorist Surveillance Program" or TSP
   - STELLARWIND
   - "National Security Agency" or NSA
   - Michael Hayden
3) All e-mails sent to or from Brett Kavanaugh between September 1, 2001, and
   May 31, 2006, containing any of these phrases:
   - "Total Information Awareness"
   - "Terrorist Information Awareness"
   - "Information Awareness Office"
   - Poindexter
4) All e-mails sent to or from Brett Kavanaugh between September 1, 2001, and
   May 31, 2006, containing any of these phrases:
   - "airport scanners"
   - "Body Scanner"
   - "Whole Body Imaging"
   - "CAPPS-II"
   - "Registered Traveler"
   - "Secure Flight"
   - PNR
5) All e-mails sent to or from Brett Kavanaugh between September 1, 2001, and
   May 31, 2006, containing any of these phrases:
   - "Patriot Act"
   - Ashcroft
   - Comey

6) All e-mails sent to or from Brett Kavanaugh between September 1, 2001, and May 31, 2006, containing any of these phrases:
   - "REAL ID"
   - Privacy Act
   - Fusion Centers

7) All records from the Collection "Staff Secretary, White House Office of the" in any Series containing "Kavanaugh, Brett" that have titles containing any of these phrases:
   - "Census data"

61. EPIC's Kavanaugh Staff Files FOIA Request sought records in Brett Kavanaugh's staff files. Specifically, EPIC sought:

1) All records from the Collection "Staff Secretary, White House Office of the" in any Series containing "Kavanaugh, Brett" that were created on the following dates:
   - March 1–10, 2004
   - October 1 – December 31, 2004
   - December 1–31, 2005

2) All records from the Collection "Staff Secretary, White House Office of the" in any Series containing "Kavanaugh, Brett" that have titles containing any of these phrases:
   - "President's Surveillance Program" or PSP
   - "Terrorist Surveillance Program" or TSP
   - STELLARWIND
   - "National Security Agency" or NSA
   - Michael Hayden

3) All records from the Collection "Counsel's Office, White House Office of the" in any Series containing "Kavanaugh, Brett" that have titles containing any of these phrases:
   - "Total Information Awareness"
   - "Terrorist Information Awareness"
   - "Information Awareness Office"
   - Poindexter

4) All records from the Collection "Staff Secretary, White House Office of the" in any Series containing "Kavanaugh, Brett" that have titles containing any of these phrases:
   - "airport scanners"
   - "Body Scanner"
   - "Whole Body Imaging"
   - "CAPPS-II"
   - "Registered Traveler"
   - "Secure Flight"
   - PNR

5) All records from the Collection "Staff Secretary, White House Office of the" in any Series containing "Kavanaugh, Brett" that have titles containing any of these phrases:
   - "Patriot Act"
   - Ashcroft
   - Comey

6) All records from the Collection "Staff Secretary, White House Office of the" in any Series containing "Kavanaugh, Brett" that have titles containing any of these phrases:
- "REAL ID"
- Privacy Act
- Fusion Centers

7) All records from the Collection "Staff Secretary, White House Office of the" in any Series containing "Kavanaugh, Brett" that have titles containing any of these phrases:
- "Census data"

62.    EPIC sought "news media" fee status under 5 U.S.C. § 552(4)(A)(ii)(II) and a waiver of all duplication fees under 5 U.S.C. § 552(a)(4)(A)(iii).

63.    EPIC also sought expedited processing under 5 U.S.C. § 552(a)(6)(E)(v)(II).

64.    EPIC received an acknowledgement letter from NARA erroneously dated "July 31, 2018."

65.    NARA granted expedited process of both of EPIC's FOIA requests.

66.    EPIC's FOIA request was given tracking numbers 2018-0258-F and 2018-0259-F.

67.    While an agency is typically required to make a determination with respect to a FOIA request within twenty business days, a request granted expedited processing must be "process[ed] as soon as practicable." 5 U.S.C. § 552(a)(6)(E)(iii).

68.    On August 27, 2018, EPIC attempted to contact the George W. Bush library reference desk to ask for a status update and to clarify the processing time. EPIC left a voicemail message, but it was never returned.

69.    On September 13, 2018, EPIC Senior Counsel Alan Butler contacted the office of NARA's FOIA Public Liaison and requested the contact information for an individual who could assist EPIC in further narrowing the scope of the requests in order to speed up the process. The staff member stated that she would call back with the necessary contact information.

70.    On September 14, 2018, Malissa Culpeper, FOIA Officer at the George W. Bush Presidential Library, sent an e-mail to EPIC FOIA Counsel Enid Zhou, directing EPIC to "see

our website concerning the completed processing of records related to the nomination and appointment of Brett Kavanaugh as judge on the U.S. Court of Appeals for the District of Columbia Circuit."

71.     On September 17, 2018, EPIC Senior Counsel Alan Butler was contacted by Shannon Jarrett, the Supervisory Archivist at the George W. Bush Presidential Library and Museum. On the call EPIC underscored the need for timely production of agency records prior to the Senate votes on Brett Kavanaugh's nomination. EPIC also indicated that it would be willing to narrow the scope of its request and the agency's search if that would make possible the production of responsive records within the necessary time frame. Ms. Jarrett stated that NARA would not be able to release records responsive to EPIC's request prior to the scheduled Senate Judiciary Committee vote on September 20, 2018 on Brett Kavanaugh's Nomination. Ms. Jarrett also confirmed that NARA has not released the names of all folders within the textual records from Brett Kavanaugh's time at the White House.

72.     NARA has not released any records in response to EPIC's two FOIA requests.

**EPIC's Constructive Exhaustion of Administrative Remedies**

73.     Today is the 44th day since NARA granted EPIC's expedited processing request.

74.     NARA has failed to make a determination regarding EPIC's FOIA Requests within the time period required by 5 U.S.C. § 552(a)(6)(A)(i).

75.     EPIC has exhausted all administrative remedies under 5 U.S.C. § 552(a)(6)(C)(i).

## Count I

**Violation of FOIA: Failure to Comply with Statutory Deadlines**

76.     Plaintiff asserts and incorporates by reference paragraphs 1–75.

77.     Defendant NARA has failed to make a determination regarding EPIC's two FOIA requests for 44 days. Thus, NARA has thus violated the deadlines under 5 U.S.C. §§ 552(a)(6)(E)(ii)(I), (a)(6)(A)(ii).

78.     Plaintiff has constructively exhausted all applicable administrative remedies under 5 U.S.C. § 552(a)(6)(C)(i).

## Count II

### Violation of FOIA: Unlawful Withholding of Agency Records

79.     Plaintiff asserts and incorporates by reference paragraphs 1–75.

80.     Defendant NARA has wrongfully withheld agency records requested by Plaintiff.

81.     Plaintiff has exhausted all applicable administrative remedies under 5 U.S.C. § 552(a)(6)(C)(i).

82.     Plaintiff is entitled to injunctive relief with respect to the release and disclosure of the requested records.

## Count III

### Claim for Declaratory Relief

83.     Plaintiff asserts and incorporates by reference paragraphs 1–75.

84.     Plaintiff is entitled under 28 U.S.C. § 2201(a) to a declaration of the rights and other legal relations of the parties with respect to the claims set forth in Counts I–III.

## Requested Relief

WHEREFORE, Plaintiff requests this Court:

   A.  Order Defendant to immediately conduct a reasonable search for all responsive records;

B.  Order Defendant to produce, by such a date as the Court deems appropriate, all responsive, non-exempt records, as well as indexes justifying withholding of any responsive records withheld under claim of an exemption;

C.  Enjoin Defendant from withholding any responsive, non-exempt records;

D.  Order Defendant to produce the records sought without the assessment of search fees;

E.  Order Defendant to grant EPIC's request for a fee waiver;

F.  Award EPIC costs and reasonable attorney's fees incurred in this action; and

G.  Grant such equitable and other relief as the Court may deem just and proper.

Respectfully Submitted,

MARC ROTENBERG, D.C. Bar # 422825
EPIC President and Executive Director

/s/ Alan Butler
ALAN BUTLER, D.C. Bar # 1012128
EPIC Senior Counsel
ELECTRONIC PRIVACY
INFORMATION CENTER
1718 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20009
(202) 483-1140 (telephone)
(202) 483-1248 (facsimile)

Dated: September 17, 2018