**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER | |
| Plaintiff, | |
| v. | |
| U.S. NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, | Civ. Action No. 18-2150 |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 3

I.   Judge Brett Kavanaugh's Nomination to the U.S. Supreme Court ..................... 3

II.   The Creation of the Warrantless Wiretapping Program ..................................... 3

III.   The Defense of the Warrantless Wiretapping Program....................................... 6

IV.   The Defense and Expansion of the Patriot Act .................................................. 8

V.   Opinion in *Klayman v. Obama* ........................................................................ 11

VI.   Testimony Before the Senate Judiciary Committee in 2018 ............................. 11

VII.   EPIC's Two FOIA Requests ............................................................................ 12

VIII.   The Freedom of Information Act and Its Progeny .......................................... 16

STANDARD OF REVIEW................................................................................................ 17

ARGUMENT .................................................................................................................... 17

I.   THE COURT HAS JURISDICTION TO GRANT THE REQUESTED RELIEF............ 18

II.   EPIC IS ENTITLED TO A PRELIMINARY INJUNCTION .......................................... 19

   A.   EPIC is likely to succeed on the merits of its claims. ............................ 21

   B.   EPIC and the public will suffer irreparable harm if relief is not granted. .............. 24

   C.   The balance of the equities favors relief. ............................................... 29

   D.   The public interest favors the requested relief. ...................................... 30

CONCLUSION ................................................................................................................. 32

# TABLE OF AUTHORITIES

**Cases**

*Al-Fayed v. CIA,*
  254 F.3d 300 (D.D.C. 2001) ................................................................. 18

*Carpenter v. United States,*
  138 S. Ct. 2206 (2018) ....................................................................... 28

*Citizens for Responsibility and Ethics in Wash. v. FEC,*
  711 F.3d 180 (D.C. Cir. 2013) ............................................................. 22

*Davis v. Pension Benefit Guar. Corp.,*
  571 F.3d 1288 (D.C. Cir. 2009) ........................................................... 17

*DOJ v. Tax Analysts,*
  492 U.S. 136 (1989) ........................................................................... 21

*Dunlap v. Presidential Advisory Comm'n on Election Integrity,*
  286 F. Supp. 3d 96 (D.D.C. 2017) ....................................................... 29

*EPIC v. DOJ,*
  15 F. Supp. 3d 32 (D.D.C. 2014) ......................................................... 22

*EPIC v. DOJ,*
  416 F. Supp. 2d 30 (D.D.C. 2006) .............................. 17, 18, 20, 21, 22, 27, 29, 30

*In re Application of the Federal Bureau of Investigation for an order Requiring*
  *the Production of Tangible Things from [Redacted]*, No. BR 06-05 (FISA Ct. 2006) ............... 9

*Klayman v. Obama,*
  805 F.3d 1148 (D.C. Cir. 2015)
  (Kavanaugh, J., concurring in the denial of rehearing en banc) ........................ 11, 28

*League of Women Voters of U.S. v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) ................................................................. 17

*NLRB v. Robbins Tire & Rubber Co.,*
  437 U.S. 352 (1976) ..................................................................... 16, 31

*Oglesby v. Dep't of the Army,*
  920 F.2d 57 (D.C. Cir. 1990) ............................................................... 18

*Payne Enters., Inc. v. United States,*
  837 F.2d 486 (D.C. Cir. 1988) ............................................................. 32

*Protect Democracy Project v. DOD,*
  263 F. Supp. 3d 293 (D.D.C. 2017) ...................................................... 31

*Riley v. California,*
  134 S. Ct. 2473 (2014) ....................................................................... 28

*Sherley v. Sebelius,*
  644 F.3d 388 (D.C. Cir. 2011) ............................................................. 17

*U.S. Ass'n of Reptile Keepers, Inc. v. Jewell,*
  103 F. Supp. 3d 133 (D.D.C. 2015) ...................................................... 17

*United States v. Jones,*
  565 U.S. 400 (2012) ........................................................................... 28

*Washington Post v. DHS,*
  459 F. Supp. 2d 61 (D.D.C. 2006) .................................................... 29, 30

**Statutes**

Electronic Freedom of Information Act Amendments of 1996, Pub. L. 104-231, 110 Stat. 3048
(1996) ............................................................................................................. 16

Freedom of Information Act, 5 U.S.C. § 552

§ 552(a)(3)(A) ................................................................................................. 22
§ 552(a)(4)(B) ................................................................................................. 18
§ 552(a)(6)(A) ................................................................................................. 19
§ 552(a)(6)(A)(i) ..................................................................................... 16, 19, 22
§ 552(a)(6)(C) ................................................................................................. 18
§ 552(a)(6)(E)(iii) ....................................................................................... 17, 19
§ 552(a)(6)(E)(v) ............................................................................................. 17
§ 552(a)(6)(E)(v)(II) ........................................................................................ 31

Presidential Records Act, 44 U.S.C. §§ 2201 et seq. ............................................ 22
§ 2204 ........................................................................................................... 22
§ 2204(c)(1) ................................................................................................... 21
§ 2208 ............................................................................................................. 1

**Other Authorities**

AOTUS Blog, *Processing the Presidential Records of Elena Kagan*, The National
Archives (June 22, 2010) ................................................................................. 30

*Brett M. Kavanaugh*, District of Columbia Circuit, U.S. Court of Appeals .................. 3

Charlie Savage, *Kavanaugh Is Pressed on Knowledge of Bush-Era Disputes*, N.Y. Times
(Sep. 5, 2018) ................................................................................................. 29

CNN, *Read Brett Kavanaugh's Written Responses to the Senate Judiciary
Committee* 90 (Sept. 12, 2018) ................................................................ 12, 13, 28

*Confirmation Hearing on the Nomination of Brett Kavanaugh to be Circuit Judge for the
District of Columbia Circuit: Hearing Before the S. Comm. on the Judiciary*, 109th
Cong. (2006) ................................................................................................... 7

*Continued Oversight of the Foreign Intelligence Surveillance Act: Hearing Before the S.
Comm. on the Judiciary*, 113th Cong. (2013) ..................................................... 10

*Continued Oversight of U.S. Gov. Surveillance Auths.: Hearing Before the S. Comm. on
the Judiciary*, 113th Cong. (2013) .................................................................... 10

C-SPAN, *Senator Leahy Pursues Questions about Privacy with Judge Kavanaugh* (Sep. 6,
2018) ............................................................................................................. 12

Dan Sewell, *Kavanaugh's support for surveilling Americans raises concerns*, Chicago
Tribune (Aug. 27, 2018) .................................................................................. 29

David S. Kris, *On the Bulk Collection of Tangible Things*, 7 J. Nat'l Security Law & Pol'y
209 (2014) ....................................................................................................... 9

David Stout, *Gonzales Testifies on Eavesdropping Change*, N.Y. Times (Jan. 18, 2007) ............. 7

E-mail from Brett Kavanaugh, Assoc. Counsel, White House to Edmund A. Walsh,
Speechwriter, White House (Oct. 24, 2001) ......................................................... 8

E-mail from Brett Kavanaugh, Assoc. Counsel, White House to John Yoo, Deputy
Assistant Att'y Gen., U.S. Dep't of Justice (Sep. 17, 2001) ................................... 4

EPIC, *EPIC v. DOJ – Warrantless Wiretapping Program* (2018) ................................ 5

Eric Lichtblau, *Bush's Law: The Remaking of American Justice* (2009) ....................... 7

George W. Bush, *Remarks on Signing the USA PATRIOT ACT of 2001* (Oct. 26, 2001) ............. 8

Gerhard Peters & John T. Woolley, University of California Santa Barbara, *The American Presidency Project: Papers of George W. Bush* (2018)............................................................. 26

*Hearing on the Report of the President's Review Grp. on Intelligence Commc'ns Techs.*, 113th Cong. (2014)........................................................................................................... 10

James Risen & Eric Lichtblau, *Bush Let U.S. Spy on Callers Without Courts*, N.Y. Times (Dec. 16, 2005)....................................................................................................................... 6

Letter from President George W. Bush to Hon. David S. Ferriero, Archivist of the United States (Nov. 15, 2010)..................................................................................... 1, 23, 24, 27

Nat'l Archives & Records Admin., 08-29-18 NARA Nomination File Production (2018) ........... 7

Nat'l Archives & Records Admin., *Records on Brett M. Kavanaugh* (last updated August 29, 2018)................................................................................................................................ 25

Nat'l Sec. Agency, Off. Of the Inspector Gen., Working Draft ST-09-0002 (2009)..................... 9

Office of Legal Counsel, U.S. Dep't of Justice, *Emails exchanged with Brett Kavanaugh, 2001-2006* (parts 1-3)............................................................................................................. 8

Office of the Inspector Gen., U.S. Dep't of Justice, *A Review of the Dep't of Justice's Involvement with the President's Surveillance Program* (July 2009).................................... 4, 5

*Oversight of the US Department of Justice: Hearing Before the S. Comm. on the Judiciary*, 110th Cong. (2007) ......................................................................................... 7

Paul Fahri, *At the Times, a Scoop Deferred*, Wash. Post (Dec. 17, 2005) ................................... 6

Privacy & Civil Liberties Oversight Board, *Report on the Telephone Records Program Conducted Under Section 215 of the USA PATRIOT Act and on the Operations of the Foreign Intelligence Surveillance Court* (Jan. 23, 2014) ......................................................... 10

Remarks on the Nomination of Brett M. Kavanaugh to be a United States Supreme Court Associate Justice, 2018 Daily Comp. Pres. Doc. 473 (July 9, 2018) ....................................... 3

*Strengthening Privacy Rights and Nat'l Sec.: Oversight of FISA Surveillance Programs: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. (2013) ...................................... 10

*The Report of the Privacy and Civil Liberties Oversight Board on Reforms to the Section 215 Telephone Records Program and the Foreign Intelligence Surveillance Court: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. (2014) (statement of Sen. Leahy).................................................................................................................................... 10

*Why Brett Kavanaugh's Hearing is Flawed: Today's Talker*, USA Today (Sep. 5, 2018)........... 11

**INTRODUCTION**

On August 1, 2018, the Electronic Privacy Information Center ("EPIC") submitted a request for agency records held by the George W. Bush Presidential Library and Museum ("Bush Library"), a component of the National Archives and Records Administration ("NARA"), concerning Supreme Court nominee Brett M. Kavanaugh and his work at the White House from January 2001 through May 2006. Specifically, EPIC submitted two FOIA requests concerning records related to Judge Kavanaugh's work as Counsel and then Staff Secretary in the White House during critical periods when the White House developed, implemented, and expanded controversial programs of surveillance on the American public. EPIC requested and was granted expedited processing for the two FOIA requests. But now, more than a month later, the Senate Judiciary Committee is about to vote on the nomination of Judge Kavanaugh to the United States Supreme Court and NARA has not issued a determination or a notice of intent to produce records responsive to EPIC's request.[1] This delay has occurred despite the fact that President Bush has instructed the Archivist to "ease" the temporary restrictions on disclosure of his Presidential records in order to facilitate greater public access.[2] Meanwhile, NARA has agreed to process other requests for Judge Kavanagh's records at the rate of 1,000 pages per week.[3]

Records released to date indicate that, as a top White House advisor, Judge Kavanaugh communicated with John Yoo, the architect of a surveillance program that was later curtailed,

[1] NARA is required by law to "promptly provide notice" of its determination to release any Presidential record to both the former and incumbent President, and must "make the notice available to the public." 44 U.S.C. § 2208. NARA makes these notices available on its website at https://www.archives.gov/foia/pra-notifications. NARA has issued six notices since August 1st but has issued no notices since August 31st.
[2] *See* Ex. G, Letter from President George W. Bush to Hon. David S. Ferriero, Archivist of the United States (Nov. 15, 2010) [hereinafter Bush Letter to Archivist].
[3] Ex. K, Notice, *Fix The Court v. NARA*, No. 18-cv-1621 (D.D.C. filed July 10, 2018).

drafted talking points for President Bush concerning the Patriot Act (that was later secretly expanded and then curtailed with passage of the Freedom Act), and defended the warrantless wiretapping program once it became known to the public. That program was also curtailed. Judge Kavanaugh also published a surprising opinion in a per curiam order, denying a petition for a rehearing en banc, in which he said that the collection of billions of telephone records on Americans is not a search, and even if it were a search, it would still be permissible under the special needs doctrine, even after evidence revealed that the program did not prevent terrorist acts.

But there is much that the American public still does not know about Judge Kavanaugh's involvement in the surveillance programs during the period January 2001 through May 2006. NARA's release of records responsive to EPIC's FOIA requests would allow EPIC to inform the American public of Judge Kavanaugh's role in developing and defending surveillance programs and his understanding of Americans' right to privacy.

Time is of the essence, a fact that NARA recognized when it granted expedited processing for EPIC's requests. Judge Kavanaugh is being considered for a lifetime appointment to the Nation's highest court. If these records are released after his confirmation, EPIC, the United States Senate, and the American public will be deprived of information essential to evaluate whether he is qualified for a position to determine the right to privacy for all Americans.

EPIC therefore requests an injunction that would compel NARA to immediately conduct a search and issue a determination on EPIC's two FOIA requests, as required by law. The requirements for an injunction are satisfied: (1) EPIC is likely to succeed on the merits of its claim because NARA has clearly violated the statutory processing deadlines of the FOIA; (2) EPIC and its members will be irreparably harmed because the records sought will only be of value to the public debate if they are produced before the Senate votes on Judge Kavanaugh's

nomination; (3) the balance of the equities favors EPIC because no other party will be harmed if

NARA is compelled to process EPIC's request immediately; and (4) an injunction is in the public

interest because an informed public debate about Judge Kavanaugh's view of privacy is

impossible without access to the records EPIC seeks.

**FACTUAL BACKGROUND**

**I.      Judge Brett Kavanaugh's Nomination to the U.S. Supreme Court**

On July 9, 2018, President Trump nominated D.C. Circuit Judge Brett M. Kavanaugh to

the U.S. Supreme Court. Remarks on the Nomination of Brett M. Kavanaugh to be a United

States Supreme Court Associate Justice, 2018 Daily Comp. Pres. Doc. 473 (July 9, 2018). Prior to

his D.C. Circuit confirmation on May 27, 2006, Judge Kavanaugh served in the White House in

the George W. Bush administration. *Id.* Judge Kavanaugh worked as an Associate Counsel and

then a Senior Associate Counsel from January 2001 to July 2003, after which he served as

Assistant to the President and then Staff Secretary until May 2006. *Brett M. Kavanaugh*, District

of Columbia Circuit, U.S. Court of Appeals.[4]

During Judge Kavanaugh's time in the White House—from January 2001 through May

2006—many of the post-September 11th surveillance systems, directed toward the American

public, were initiated and implemented, including the warrantless wiretapping program, Total

Information Awareness, airport body scanners, passenger profiling, the secret expansion of the

Patriot Act and a national identification system for Americans. Compl. ¶ 13.

**II.     The Creation of the Warrantless Wiretapping Program**

On September 17, 2001, Judge Kavanaugh wrote an e-mail to John Yoo, a Department of

Justice ("DOJ") attorney who subsequently drafted the legal opinion that provided the basis for

---

[4] https://www.cadc.uscourts.gov/internet/home.nsf/Content/VL+-+Judges+-+BMK.

3

the warrantless wiretapping program, which was later curtailed. In the message, Judge Kavanaugh wrote: "Any results yet on the 4A implications of random/constant surveillance of phone and e-mail conversations of non-citizens who are in the United States when the purpose of the surveillance is to prevent terrorist/criminal violence?" E-mail from Brett Kavanaugh, Assoc. Counsel, White House to John Yoo, Deputy Assistant Att'y Gen., U.S. Dep't of Justice (Sep. 17, 2001).[5] Mr. Yoo authored a memorandum dated the same day—September 17, 2001—titled "Constitutional Standards on Random Electronic Surveillance for Counter-Terrorism Purposes." Office of the Inspector Gen., U.S. Dep't of Justice, *A Review of the Dep't of Justice's Involvement with the President's Surveillance Program* 13 (July 2009) [hereinafter DOJ Report on President's Surveillance Program].[6] No subsequent e-mails between Judge Kavanaugh and Mr. Yoo regarding this program have been released to the public.

President Bush issued the first authorization for the warrantless wiretapping program on October 4, 2001. *Id*. at 29. He signed a total of 43 authorizations between that date and December 8, 2006. *Id*. Those involved in the authorization included Mr. Yoo, NSA Director Michael V. Hayden, Counsel to the Vice President David S. Addington, and Judge Kavanaugh's direct supervisor, White House Counsel Alberto R. Gonzales. *Id*. at 30. No e-mail communications between Judge Kavanaugh and Mr. Gonzales, or any other senior official associated with this program, have been released to the public.

Between May 2003, when Mr. Yoo resigned from the DOJ, and May 2004, DOJ officials raised concerns about the legality of the warrantless wiretapping program with the White House.

[5] *Available at* https://int.nyt.com/data/documenthelper/264-purported-kavanaugh-e-mail-to/702e332fddd3bf0416f3/optimized/full.pdf#page=1.
[6] *Available at* https://ia600305.us.archive.org/17/items/Report-President-Surveillance-Program-2009/Report-President-Surveillance-Program-2009.pdf.

4

*Id.* at 39. Mr. Yoo's replacement, Patrick Philbin, was read into the program to assume Mr. Yoo's role. *Id.* After Mr. Philbin reviewed Mr. Yoo's prior memoranda, he discovered that "Yoo had omitted from his analysis any reference to the FISA provision" that restricted warrantless interceptions. At Ashcroft's direction, Mr. Philbin began drafting a memorandum to assess the legality of the program. *Id.* at 36–37. Then, on October 6, 2003, Jack Goldsmith was sworn in as Assistant Attorney General for the Office of the Legal Counsel ("OLC"), and Mr. Philbin convinced Mr. Addington that Mr. Goldsmith be read in to the program. *Id.* Goldsmith agreed with Mr. Philbin's concerns about the legality of the program and subsequently wrote a memorandum on May 6, 2004, reassessing its legality. *Id.* at 38. *See also* EPIC, *EPIC v. DOJ – Warrantless Wiretapping Program* (2018).[7]

During the period from December 2003 to May 2004, Mr. Goldsmith and Mr. Philbin met with Mr. Addington and Mr. Gonzales numerous times to discuss the legal problems they had identified; they also requested that Deputy Attorney General James B. Comey be read in to the program. DOJ Report on President's Surveillance Program, *supra*, at 39. Deputy Attorney General Comey raised concerns about the legality of the program with Attorney General Ashcroft on March 4, 2004. *Id.* at 40. Soon after that meeting, Ashcroft fell ill and was hospitalized. With the program set to expire on March 11, White House officials reached an impasse because Mr. Comey, Mr. Goldsmith, and Mr. Philbin refused to sign off on the program; this precipitated a dramatic scene at Mr. Ashcroft's hospital bed on March 10, 2004. *See id.* at 40–44.

In summary, Judge Kavanaugh outlined the contours of the warrantless wiretapping program in a September 2001 e-mail to Mr. Yoo, who then became the architect of the program;

---

[7] https://epic.org/privacy/nsa/foia/#foia (linking to a copy of the Goldsmith memorandum obtained by EPIC under the FOIA).

Judge Kavanaugh worked directly for the White House counsel who was central to the program; and DOJ officials raised numerous concerns about the program with White House officials while Judge Kavanaugh was Assistant to the President and then Staff Secretary. And yet, none of Judge Kavanaugh's records concerning these events have been made public.

## III.    The Defense of the Warrantless Wiretapping Program

The warrantless wiretapping program was carried out in secret, without judicial oversight, until the publication of a *New York Times* article on December 16, 2005. James Risen & Eric Lichtblau, *Bush Let U.S. Spy on Callers Without Courts*, N.Y. Times (Dec. 16, 2005).[8] The reporters had first learned about the program in early 2004, but White House officials convinced the *Times* to delay publication, and keep the facts of the program from the American public, for more than a year. James Risen, *The Biggest Secret*, The Intercept (Jan. 3, 2018);[9] *See also*, Paul Fahri, *At the Times, a Scoop Deferred*, Wash. Post (Dec. 17, 2005) ("the Times said in its story that it held off publishing the 3,600-word article for a year after the newspaper's representatives met with White House officials.")[10] Subsequent hearings in Congress led to the end of the program. *Oversight of the US Department of Justice: Hearing Before the S. Comm. on the Judiciary*, 110th Cong. (2007);[11] *see also*, David Stout, *Gonzales Testifies on Eavesdropping Change*, N.Y. Times (Jan. 18, 2007).[12]

---

[8] https://www.nytimes.com/2005/12/16/politics/bush-lets-us-spy-on-callers-without-courts.html. EPIC filed the first FOIA request and successfully sued the Department of Justice for the release of documents concerning the warrantless wiretapping program. *See* EPIC, *EPIC v. DOJ – Warrantless Wiretapping Program*, https://epic.org/privacy/nsa/foia/.

[9] https://theintercept.com/2018/01/03/my-life-as-a-new-york-times-reporter-in-the-shadow-of-the-war-on-terror/.

[10] http://www.washingtonpost.com/wp-dyn/content/article/2005/12/16/AR2005121601716.html.

[11] https://www.c-span.org/video/?196247-1/justice-department-oversight.

[12] https://www.nytimes.com/2007/01/18/washington/18cnd-justice.html.

During his 2006 confirmation hearings for the D.C. Circuit, Judge Kavanaugh told the

Senate Judiciary Committee that he "learned of . . . reports of that program when there was a *New

York Times* story that came over the wire" in December 2005. *Confirmation Hearing on the

Nomination of Brett Kavanaugh to be Circuit Judge for the District of Columbia Circuit: Hearing

Before the S. Comm. on the Judiciary*, 109th Cong. 42–43; 49 (2006).[13] After the nomination

hearing, Judge Kavanaugh stated that, after the story broke, "the President [spoke] publicly about

the program on numerous occasions and I have performed my ordinary role as Staff Secretary

with respect to staffing the President's public speeches." Nat'l Archives & Records Admin., 08-

29-18 NARA Nomination File Production 181–82 (2018).[14]

According to a Pulitzer Prize-winning book that recounted the days in December 2005

after the warrantless wiretapping story became public, Judge Kavanaugh was a key member of the

White House team that defended the program. "'It is not good,' Kavanaugh wrote, 'if Americans

or Members of Congress think we did something that is a good thing but stretched the law in

doing . . . we need to fight back hard on the legal part in the court of public opinion and the court

of Congress.'" Eric Lichtblau, *Bush's Law: The Remaking of American Justice* 225 (2009). The

DOJ has released a set of e-mails sent between Judge Kavanaugh and officials in the OLC. *See*

Office of Legal Counsel, U.S. Dep't of Justice, *Emails exchanged with Brett Kavanaugh, 2001-

2006* (parts 1-3).[15] The e-mails, which include a series of messages concerning the

administration's response to the *New York Times* story sent between December 19 and December

22, 2005, are heavily redacted and therefore Judge Kavanaugh's substantive comments on the

---

[13] https://www.gpo.gov/fdsys/pkg/CHRG-109shrg27916/pdf/CHRG-109shrg27916.pdf.
[14] https://www.judiciary.senate.gov/imo/media/doc/08-29-18%20NARA%20Nomination%20File%20Production.pdf.
[15] *Available at* https://www.justice.gov/olc/olc-foia-electronic-reading-room.

defense of the warrantless wiretapping program and the White House's response to the *New York Times* story have not been made available to the public. *See id.* at pt. 1, pgs. 151–91.[16] The OLC release does not include the e-mail sent by Judge Kavanaugh to John Yoo on September 17, 2001.

### IV.    The Defense and Expansion of the Patriot Act

Judge Kavanaugh also played a central role in the adoption and defense of the Patriot Act, which he described as a "measured, careful, responsible, and constitutional approach." E-mail from Brett Kavanaugh, Assoc. Counsel, White House to Edmund A. Walsh, Speechwriter, White House (Oct. 24, 2001).[17] Kavanaugh drafted talking points in support of the Patriot Act that were later incorporated into President Bush's signing statement. *Id.* He wrote, "the new law will update laws authorizing government surveillance. These laws were enacted decades ago by Congress in an era of rotary telephones. These laws must be updated to account for e-mail, internet usage, cellular phones, and other forms of modern communication." *Id.* President Bush adopted the "rotary phones" characterization in his signing statement, stating "The existing law was written in the era of rotary telephones. This new law that I sign today will allow surveillance of all communications used by terrorists, including e-mails, the Internet, and cell phones." George W. Bush, *Remarks on Signing the USA PATRIOT ACT of 2001* (Oct. 26, 2001).[18] But Judge Kavanaugh's description of the Patriot Act revealed a deep misunderstanding of modern privacy law. The Patriot Act diminished privacy protections in the Cable Act, 47 U.S.C. § 551, and the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2701 et seq., neither of which were from "the era of the rotary phone," as Judge Kavanaugh wrote. The Cable Act protected the privacy of interactive video records. The EPCA protected e-mail.

---

[16] https://www.justice.gov/olc/page/file/1088011/download.
[17] *Available at* page 689–90 https://www.judiciary.senate.gov/imo/media/doc/08-02-18%20GWB%20Document%20Production%20-%20Pages%201%20-%205,735.pdf.
[18] http://www.presidency.ucsb.edu/ws/?pid=63850.

Judge Kavanaugh was Assistant to the President and Staff Secretary prior to passage of the USA PATRIOT Act Additional Reauthorizing Amendments Act of 2006, Pub. L. 109-178, 120 Stat. 278 (Mar. 9, 2006), which further expanded surveillance authorities. He was also Assistant to the President and Staff Secretary during the transition of the "telephony metadata program" to the bulk surveillance orders issued under Section 215 of the Patriot Act. The first Section 215 order for bulk telephony metadata was issued on May 24, 2006. *In re Application of the Federal Bureau of Investigation for an order Requiring the Production of Tangible Things from [Redacted]*, No. BR 06-05 (FISA Ct. 2006);[19] *see also* David S. Kris, *On the Bulk Collection of Tangible Things*, 7 J. Nat'l Security Law & Pol'y 209, 213 (2014); Nat'l Sec. Agency, Off. Of the Inspector Gen., Working Draft ST-09-0002, at 39 (2009) [hereinafter NSA IG Working Draft Report].[20] According to an NSA Inspector General's report, the publication of the *New York Times* story in December of 2005 lead to the transition of the telephony metadata program to Section 215 because one of the participating telephone providers "expressed concern about providing telephony metadata to the NSA under Presidential authority without being compelled." NSA IG Working Draft Report at 39.

After the Section 215 program was revealed to the public on June 6, 2013, it was harshly criticized by Members of Congress. *See Hearing on the Report of the President's Review Grp. on Intelligence Commc'ns Techs.* 113th Cong. (2014);[21] *Continued Oversight of U.S. Gov. Surveillance Auths.: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. (2013);[22]

---

[19] https://www.dni.gov/files/documents/section/pub_May%2024%202006%20Order%20from%20FISC.pdf.
[20] https://www.documentcloud.org/documents/718895-igreport.html.
[21] https://www.judiciary.senate.gov/meetings/hearing-on-the-report-of-the-presidents-review-group-on-intelligence-and-communications-technologies
[22] https://www.judiciary.senate.gov/meetings/updated-continued-oversight-of-us-government-surveillance-authorities.

*Continued Oversight of the Foreign Intelligence Surveillance Act: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. (2013);[23] *Strengthening Privacy Rights and Nat'l Sec.: Oversight of FISA Surveillance Programs: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. (2013).[24] The Privacy and Civil Liberties Oversight Board concluded in its review of the program that it had "not identified a single instance involving a threat to the United States in which the program made a concrete difference in the outcome of a counterterrorism investigation." Privacy & Civil Liberties Oversight Board, *Report on the Telephone Records Program Conducted Under Section 215 of the USA PATRIOT Act and on the Operations of the Foreign Intelligence Surveillance Court* 11 (Jan. 23, 2014).[25] Senator Leahy further emphasized after the report was released that "the administration has not demonstrated that the Section 215 phone records collection program is uniquely valuable enough to justify the massive intrusion on Americans' privacy." *The Report of the Privacy and Civil Liberties Oversight Board on Reforms to the Section 215 Telephone Records Program and the Foreign Intelligence Surveillance Court: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. (2014) (statement of Sen. Leahy).[26] Congress subsequently passed the USA FREEDOM Act in 2015, ending the bulk collection program and amending Section 215. Pub. L. 114-23, 129 Stat. 268 (June 2, 2015).

E-mails concerning Judge Kavanaugh's role in the secret expansion of the Patriot Act and the expansion of the Section 215 program involving bulk collection of telephone records of Americans, have not been made available to the public.

---

[23] https://www.judiciary.senate.gov/meetings/continued-oversight-of-the-foreign-intelligence-surveillance-act.

[24] https://www.judiciary.senate.gov/meetings/time-change-and-location-change-strengthening-privacy-rights-and-national-security-oversight-of-fisa-surveillance-programs.

[25] https://www.pclob.gov/library/215-Report_on_the_Telephone_Records_Program.pdf.

[26] https://www.judiciary.senate.gov/imo/media/doc/7-31-13LeahyStatement.pdf.

## V.        Opinion in *Klayman v. Obama*

Judge Kavanaugh later defended warrantless surveillance in a surprising concurring

opinion in *Klayman v. Obama*, 805 F.3d 1148 (D.C. Cir. 2015) (Kavanaugh, J., concurring in the

denial of rehearing en banc) . Judge Kavanaugh stated that the "bulk collection of telephony data"

is not a search and is "entirely consistent with the Fourth Amendment." *Id*. at 1148-49. He stated

further that if it was a search, the search would be reasonable because the collection of the

personal data serves "a special need." *Id*. No court had ever recognized the "special needs"

doctrine without a showing that the conduct in fact advances a governmental interest.

## VI.       Testimony Before the Senate Judiciary Committee in 2018

As of September 5, 2018, only 7% of the records from Judge Kavanaugh's time as

Counsel and Staff Secretary at the White House had been disclosed to the Senate Committee on

the Judiciary, and only 4% had been disclosed to the public. *Why Brett Kavanaugh's Hearing is

Flawed: Today's Talker*, USA Today (Sep. 5, 2018).[27]

In testimony before the Senate Judiciary Committee on September 6, 2018, Kavanaugh

acknowledged that *Carpenter v. United States*, 138 S. Ct. 2206 (2018), was a "game changer," but

he failed to justify or revise his assertion of the special needs doctrine in the face of clear evidence

that the warrantless surveillance program he defended did not prevent any terrorist acts. C-SPAN,

*Senator Leahy Pursues Questions about Privacy with Judge Kavanaugh* (Sep. 6, 2018).[28]

On September 10, 2018, Senator Durbin asked Judge Kavanaugh in writing to "describe

the full extent of your involvement in questions about warrantless surveillance of American while

you were working in the White House." CNN, *Read Brett Kavanaugh's Written Responses to the*

---

[27] https://www.usatoday.com/story/opinion/2018/09/05/brett-kavanaughs-hearing-flawed-release-records-talker/1201831002/.

[28] https://www.c-span.org/video/?c4748241/senator-leahy-pursues-questions-privacy-judge-kavanaugh.

*Senate Judiciary Committee* 90 (Sept. 12, 2018).[29] Judge Kavanaugh responded, "As I explained in the hearing, in the wake of September 11th, it was 'all hands on deck' in the White House and in the White House Counsel's Office. While I do not have specific recollections, I cannot rule out having discussed warrantless surveillance generally in the wake of the attacks. I believe everyone was discussing actions to protect America from attack. As I further explained during the hearing, my testimony in 2006 was accurate regarding the fact that I did not know about the Terrorist Surveillance Program, or TSP, until it became public in December 2005." *Id*. E-mails relating to warrantless surveillance, with the exception of the September 17, 2001 e-mail to Mr. Yoo, have not been made available to the public.

On September 10, 2018, Senator Leahy asked Judge Kavanaugh in writing whether he was aware of Mr. Yoo's September 17, 2001, memorandum on warrantless surveillance. *Id*. at 53–54. Judge Kavanaugh said, "I cannot specifically recall every memorandum that I may have seen while working for the White House Counsel's Office." *Id*. In response to Senator Leahy's question of whether he had "any conversations of any type via e-mail, over the phone, in person or otherwise" with John Yoo between September 17, 2001, and October 4, 2001, "regarding warrantless surveillance of phone and/or e-mail conversations within the United States," Judge Kavanaugh responded, "I cannot specifically recall every conversation that I may have had while working for the White House Counsel's Office." *Id*. Related e-mails have not been made available to the public.

## VII.   EPIC's Two FOIA Requests

On August 1, 2018, EPIC submitted two FOIA requests ("EPIC's Kavanaugh E-mails FOIA Request" and "EPIC's Kavanaugh Staff Files FOIA Request) to the Bush Library via e-

---

[29] https://www.cnn.com/2018/09/12/politics/kavanaugh-written-responses-09-12/index.html.

mail. Ex. A; Ex. B. EPIC's Kavanaugh E-mails FOIA Request sought records of e-mails to and

from Judge Kavanaugh concerning various proposals for surveillance of the American public

during his time at the White House as Associate Counsel and Senior Associate Counsel in 2001–

2003 and Staff Secretary in 2003–2006. Ex. A. Specifically, EPIC sought:

1) All e-mails sent to or from Brett Kavanaugh on the following dates:
   - March 1–10, 2004
   - October 1 – December 31, 2004
   - December 1–31, 2005
2) All e-mails sent to or from Brett Kavanaugh between September 1, 2001, and May 31, 2006, containing any of these phrases:
   - "President's Surveillance Program" or PSP
   - "Terrorist Surveillance Program" or TSP
   - STELLARWIND
   - "National Security Agency" or NSA
   - Michael Hayden
3) All e-mails sent to or from Brett Kavanaugh between September 1, 2001, and May 31, 2006, containing any of these phrases:
   - "Total Information Awareness"
   - "Terrorist Information Awareness"
   - "Information Awareness Office"
   - Poindexter
4) All e-mails sent to or from Brett Kavanaugh between September 1, 2001, and May 31, 2006, containing any of these phrases:
   - "airport scanners"
   - "Body Scanner"
   - "Whole Body Imaging"
   - "CAPPS-II"
   - "Registered Traveler"
   - "Secure Flight"
   - PNR
5) All e-mails sent to or from Brett Kavanaugh between September 1, 2001, and May 31, 2006, containing any of these phrases:
   - "Patriot Act"
   - Ashcroft
   - Comey
6) All e-mails sent to or from Brett Kavanaugh between September 1, 2001, and May 31, 2006, containing any of these phrases:
   - "REAL ID"
   - Privacy Act
   - Fusion Centers

7) All records from the Collection "Staff Secretary, White House Office of the" in any Series containing "Kavanaugh, Brett" that have titles containing any of these phrases:
   - "Census data"

Ex. A at 1–2. EPIC's Kavanaugh Staff Files FOIA Request sought records in Brett Kavanaugh's

staff files. Ex. B. Specifically, EPIC sought:

1) All records from the Collection "Staff Secretary, White House Office of the" in any Series containing "Kavanaugh, Brett" that were created on the following dates:
   - March 1–10, 2004
   - October 1 – December 31, 2004
   - December 1–31, 2005
2) All records from the Collection "Staff Secretary, White House Office of the" in any Series containing "Kavanaugh, Brett" that have titles containing any of these phrases:
   - "President's Surveillance Program" or PSP
   - "Terrorist Surveillance Program" or TSP
   - STELLARWIND
   - "National Security Agency" or NSA
   - Michael Hayden
3) All records from the Collection "Counsel's Office, White House Office of the" in any Series containing "Kavanaugh, Brett" that have titles containing any of these phrases:
   - "Total Information Awareness"
   - "Terrorist Information Awareness"
   - "Information Awareness Office"
   - Poindexter
4) All records from the Collection "Staff Secretary, White House Office of the" in any Series containing "Kavanaugh, Brett" that have titles containing any of these phrases:
   - "airport scanners"
   - "Body Scanner"
   - "Whole Body Imaging"
   - "CAPPS-II"
   - "Registered Traveler"
   - "Secure Flight"
   - PNR
5) All records from the Collection "Staff Secretary, White House Office of the" in any Series containing "Kavanaugh, Brett" that have titles containing any of these phrases:
   - "Patriot Act"
   - Ashcroft
   - Comey
6) All records from the Collection "Staff Secretary, White House Office of the" in any Series containing "Kavanaugh, Brett" that have titles containing any of these phrases:
   - "REAL ID"
   - Privacy Act
   - Fusion Centers

14

7) All records from the Collection "Staff Secretary, White House Office of the" in any
Series containing "Kavanaugh, Brett" that have titles containing any of these phrases:
- "Census data"

Ex. B at 1-2. EPIC sought "news media" fee status under 5 U.S.C. § 552(4)(A)(ii)(II) and a

waiver of all duplication fees under 5 U.S.C. § 552(a)(4)(A)(iii). Ex. A at 6–8; Ex. B at 6–8. EPIC

also sought expedited processing under 5 U.S.C. § 552(a)(6)(E)(v)(II). Ex. A at 4–6; Ex. B at 4–6.

On August 2, 2018, EPIC received acknowledgement letters from NARA erroneously

dated "July 31, 2018." Ex. C; Ex. D. NARA also granted expedited process of both of EPIC's

FOIA requests. Ex. E; Ex. F. EPIC's FOIA requests were given tracking numbers 2018-0258-F

and 2018-0259-F. Ex. C; Ex. D.

On August 27, 2018, EPIC attempted to contact the Bush Library reference desk to ask for

a status update and to clarify the processing time. Compl. ¶ 68. EPIC left a voicemail message,

but it was never returned. *Id*. On September 13, 2018, EPIC Senior Counsel Alan Butler contacted

the office of NARA's FOIA Public Liaison and requested the contact information for an

individual who could assist EPIC in further narrowing the scope of the requests in order to speed

up the process. *Id*. at ¶ 69. The staff member stated that she would call back with the necessary

contact information. *Id*. On September 14, 2018, Malissa Culpeper, FOIA Officer at the Bush

Library, sent an e-mail to EPIC FOIA Counsel Enid Zhou, directing EPIC to "see our website

concerning the completed processing of records related to the nomination and appointment of

Brett Kavanaugh as judge on the U.S. Court of Appeals for the District of Columbia Circuit."

Ex. J.

On September 17, 2018, EPIC Senior Counsel Alan Butler was contacted by Shannon

Jarrett, the Supervisory Archivist at the Bush Library. Comp. ¶ 71. During the call EPIC's

attorney underscored the need for timely production of agency records prior to the Senate votes

on Brett Kavanaugh's nomination. *Id*. EPIC's attorney also indicated that EPIC would be willing to narrow the scope of its request and the agency's search if that would make possible the production of responsive records within the necessary time frame. *Id*. Ms. Jarrett stated that NARA would not be able to release records responsive to EPIC's request prior to the scheduled Senate Judiciary Committee vote on September 20, 2018 on Judge Kavanaugh's Nomination. *Id*. Ms. Jarrett also confirmed that NARA has not released the names of all folders within the textual records from Judge Kavanaugh's time at the White House. *Id*.

NARA has not released any records in response to EPIC's two FOIA requests or issued a determination as required under the FOIA.

## VIII.   The Freedom of Information Act and Its Progeny

The FOIA's purpose is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 352, 261 (1976). Congress later passed the Electronic Freedom of Information Act Amendments of 1996, Pub. L. 104-231, 110 Stat. 3048 (1996), that, *inter alia*, required that agencies process certain categories of documents on an expedited basis. *Id*. § 8, 110 Stat. 3052 (codified at 5 U.S.C. § 552(a)(6)(E)). Typically, a FOIA Request must be processed within twenty business days. 5 U.S.C. § 552(a)(6)(A)(i). However, expedited processing is to be granted in cases where either the "failure to obtain requested records . . . could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," or "with respect to a request made by a person primarily engaged in disseminating information" there is an "urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v). In these cases, an agency must process the FOIA request "as soon as practicable." 5 U.S.C. § 552(a)(6)(E)(iii). "Where an agency fails to comply with the twenty-day deadline applicable to a standard FOIA request, the agency

16

'presumptively also fails to process an expedited request 'as soon as practicable." *EPIC v. DOJ*, 416 F. Supp. 2d 30, 39 (D.D.C. 2006).

## STANDARD OF REVIEW

In order to obtain a preliminary injunction, a plaintiff must show that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in their favor, and (4) that an injunction is in the public interest. *U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 140 (D.D.C. 2015); *see Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)). This Court has held that plaintiffs are entitled to preliminary injunctive relief where, as here, they can demonstrate "a likelihood of success on the merits" and "have also shown that they will suffer at least some substantial irreparable harm if their request for injunctive relief is denied." *Reptile Keepers*, 103 F. Supp. 3d at 166. The D.C. Circuit has adopted a "sliding scale" approach when evaluating these injunction factors. *Sherley*, 644 F.3d at 392. Thus, if the "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make a strong showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009). *But see League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) (noting that the court has "not yet decided" whether the sliding scale approach applies post-*Winter*).

## ARGUMENT

Although NARA acknowledged EPIC's legal entitlement to expedited processing of its FOIA requests over one month ago, NARA has failed to comply with the FOIA's provisions for expedited processing. In fact, NARA has already exceeded the statutory deadline of twenty working days for responding to a standard, non-expedited request. NARA's failure to process EPIC's FOIA requests constitutes a continuing impediment to EPIC's (and the public's) ability to

examine Judge Kavanaugh's role in developing and defending surveillance programs, including

the Patriot Act and warrantless surveillance, and to participate meaningfully in the debate over

Judge Kavanaugh's nomination. NARA's inaction is clearly unlawful and should be enjoined.

## I.    THE COURT HAS JURISDICTION TO GRANT THE REQUESTED RELIEF

The FOIA grants this Court clear jurisdiction to consider this matter and grant appropriate

relief:

> On complaint, the district court of the United States . . . in the District of Columbia,
> has jurisdiction to enjoin the agency from withholding agency records and to order
> the production of any agency records improperly withheld from the complainant. In
> such a case the court shall determine the matter de novo.

5 U.S.C. § 552(a)(4)(B); *Al-Fayed v. CIA*, 254 F.3d 300, 304 (D.D.C. 2001). The statute further

provides:

> [a]ny person making a request to any agency for records . . . shall be deemed to have
> exhausted his administrative remedies with respect to such request if the agency fails
> to comply with the applicable time limit provisions of this paragraph.

5 U.S.C. § 552(a)(6)(C); *Oglesby v. Dep't of the Army*, 920 F.2d 57, 62 (D.C. Cir. 1990) ("If the

agency has not responded within the statutory time limits, then . . .  the requester may bring

suit."). "[T]he FOIA imposes no limits on courts' equitable powers in enforcing its terms and

unreasonable delays in disclosing non-exempt documents violate the intent and purpose of the

FOIA, and the courts have a duty to prevent such abuses." *EPIC v. DOJ,* 416 F. Supp. 2d at 35

(citing *Payne Enters v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988)) (internal citations

omitted). Here, notwithstanding its agreement to "expedite" EPIC's FOIA Request, NARA has

failed to issue a determination even within the statutory time limit of twenty working days

established by 5 U.S.C. § 552(a)(6)(A). All applicable administrative remedies have therefore

been exhausted and EPIC's claim is ripe for adjudication.

18

## II.     EPIC IS ENTITLED TO A PRELIMINARY INJUNCTION

The U.S. Senate is expected to vote shortly on Judge Kavanaugh's nomination to the U.S. Supreme Court. The original vote was scheduled for today, September 20, 2018. Yet the Senators would be voting without all the relevant facts about Judge Kavanaugh's role in developing and promoting controversial surveillance programs during his time in the Bush White House. Whomever is confirmed to fill the vacant Supreme Court seat will have a substantial influence on privacy rights for a generation to come. Yet, absent an order from this Court, NARA is unlikely to make a determination about EPIC's two FOIA requests before the Senate votes on Judge Kavanaugh's nomination. Failure to make a determination before the votes will deprive EPIC, the United States, and the American public of the ability to participate in an informed debate about Judge Kavanaugh's role in the warrantless surveillance programs and the Patriot Act. If any FOIA case presents the type of extraordinary circumstance that justifies preliminary injunctive relief, this is it.

First and foremost, NARA has violated the FOIA by failing to make any determination "as soon as practicable" after it granted EPIC's request for expedited processing. 5 U.S.C. § 552(a)(6)(E)(iii). NARA has also violated the FOIA by failing to issue a determination on EPIC's FOIA requests within the standard twenty working day period. 5 U.S.C. § 552(a)(6)(A)(i).

Second, NARA's failure to process and release records responsive to EPIC's FOIA requests prior to the Senate's votes on Judge Kavanaugh's nomination will cause irreparable harm to EPIC, its members, and the public. NARA has yet to identify a date by which it expects to complete processing on EPIC's requests. It has also indicated that it may take more than sixty days to release any responsive documents.[30] The Senate votes will most likely occur in less than

---

[30] This is due to the statutory notice requirement discussed in FN 1, *supra*, but that delay can be avoided if both the former and incumbent President agree to waive their privilege claims.

sixty days. EPIC has routinely provided public statements to the Senate Judiciary Committee regarding a Supreme Court nominee's views on privacy rights. If NARA fails to release responsive documents before the Senate votes on Kavanaugh's nomination, it will prevent EPIC from informing the American public about Kavanaugh's role in the post-9/11 surveillance programs.

Third, the balance of the equities favors relief because other parties will suffer no hardship if NARA is compelled to produce records responsive to EPIC's FOIA requests. NARA can hardly claim that compliance with its statutory obligations is a hardship. Further, NARA has responded to other records requests that required reviewing a large quantity of records in a short period of time. Other FOIA requesters will not be unduly burdened because FOIA's expedited processing provision establishes a system where some requests are prioritized over others. *See EPIC v. DOJ*, 416 F. Supp. 2d at 41 (noting in a similar case that the Government conceded "that this factor of the preliminary injunction inquiry weighs in EPIC's favor").

Fourth, granting the injunction would be in the public interest. The FOIA was enacted to promote government transparency and to ensure that the American public is able to participate in public debates in an informed manner. But the public cannot have an informed debate about Kavanaugh's involvement in post-911 surveillance and his understanding of the right to privacy until NARA releases records responsive to EPIC's FOIA requests. Because this is a lifetime appointment, the opportunity to participate in the debate around Brett Kavanaugh's confirmation will end once the Senate votes on his nomination. Thus, the public interest is strongly in favor of NARA's release of responsive records before the Senate votes on Judge Kavanaugh's nomination. Indeed, in the earlier case where EPIC first sought disclosure of documents from the Department of Justice related to President Bush's warrantless wiretapping program, the Court granted a

preliminary injunction and ordered the agency to "produce or identify all responsive records within 20 days." *EPIC v. DOJ*, 416 F. Supp. 2d at 43.

For these reasons, this Court should grant EPIC's order enjoining NARA to make an immediate determination of EPIC's two FOIA requests.

> **A.     EPIC is likely to succeed on the merits of its claims.**

NARA has already acknowledged EPIC's entitlement to expedited processing, and only two questions remain for this Court: (1) whether EPIC is entitled to prompt determinations on its two FOIA requests; and (2) whether NARA has processed EPIC's FOIA requests in an expedited manner as required under the FOIA. EPIC is certain to succeed on both claims.

EPIC's two FOIA requests reasonably describe agency records and were submitted in compliance with all applicable FOIA procedures; EPIC is entitled to a determination on these requests. The documents EPIC seeks are e-mails and staff files from Judge Kavanaugh's tenure at the Bush White House, and are records of the Bush Library, a component of NARA. These are agency records that are subject FOIA. *See DOJ v. Tax Analysts*, 492 U.S. 136, 144-45 (1989) (defining "agency records" as materials "create[d] or obtain[ed]" by an agency and within an agency's control at the time the request is made); 44 U.S.C. § 2204(c)(1) (providing that Presidential records "shall be administered in accordance with" the FOIA and "shall be deemed records of the National Archives and Records Administration."). EPIC's FOIA requests include detailed document categories for the e-mails and staff files, as well as date ranges and a short list of specific search terms. 5 U.S.C. § 552(a)(3)(A).

NARA has clearly failed to satisfy FOIA's statutory deadline for making a determination on EPIC's requests. According to the FOIA, NARA was required to "determine within 20 days (except Saturdays, Sundays, and legal public holidays) after the receipt of . . . [a] request whether

to comply with such request and shall immediately notify the person making such request of such determination[.]" 5 U.S.C. § 552(a)(6)(A)(i).

NARA also granted EPIC's request for expedited processing, which means the agency bears a heightened obligated to process the request "as soon as practicable." 5 U.S.C. § 552(a)(6)(E)(iii). Failure to meet the standard twenty-day FOIA deadline is also presumptively a failure to process a request "as soon as practicable." *EPIC v. DOJ*, 416 F. Supp. 2d at 39. A determination requires NARA to "at least indicate within the relevant time period the scope of the documents it will produce and the exemptions it will claim with respect to any withheld documents." *Citizens for Responsibility and Ethics in Wash. v. FEC*, 711 F.3d 180, 182-83 (D.C. Cir. 2013); *EPIC v. DOJ*, 15 F. Supp. 3d 32, 40–41 (D.D.C. 2014) (discussing the *CREW v. FEC* standard). NARA has failed to provide even this minimal amount of information. Because it has been thirty-six days since NARA received EPIC's two FOIA requests on August 1, 2018, NARA has failed to comply with the twenty-day time frame required by the FOIA for issuing a determination on a standard FOIA request, let alone the time frame required for an expedited request.

The records that EPIC has requested are subject to the Presidential Records Act, 44 U.S.C. §§ 2201 et seq., which does impose certain additional restrictions on disclosure during the 12-year period after a President leaves office. 44 U.S.C. § 2204. However, many of the records held by the Bush Library are subject to fewer restrictions and a presumption of disclosure because President Bush directed the Archivist to "ease" two of the restrictions in 2010. Ex. G, Bush Letter to Archivist. Specifically, President Bush wrote to the Archivist on November 15, 2010, and instructed NARA to "ease for review and processing purposes the restriction criteria" for records "relating to appointments to Federal office" (§ 2204(a)(2)) and of "confidential communications

22

requesting or submitting advice, between the President and the President's advisers, or between

such advisers" (§ 2204(a)(5)). *Id.* at 1.

President Bush instructed NARA that he would generally "like to waive [the] restriction

for records containing more routine communications during [his] Administration" and provided

nine specific categories of communications that he deemed "routine advisory." *Id.* at 1–2. These

categories are:

1. Scheduling files, including daily schedules, drafts, and routine background materials relating to schedules;
2. Background materials, drafts, and other preparatory materials regarding Presidential proclamations, declarations, special messages, and executive orders;
3. Draft press releases;
4. Talking points, fact sheets, and other similar communications regarding final policy decisions including drafts and background materials;
5. Routine White House staffing memoranda and comments;
6. Memoranda and reports provided to the President, including drafts, which are purely informational or factual in content, including position papers, reports, and studies that examine an issue;
7. Requests and referrals from White House staff to other staff or agency officials seeking guidance and input in the preparation of routine responses to inquiries and the information received by White House staff;
8. Routine memoranda and recommendations analyzing and/or making recommendations regarding Administration positions on legislation or recommending Presidential approval or disapproval of legislation and congressional resolutions; and
9. Speech related drafts that only contain minor grammatical or routine clerical changes that do not make any substantive changes in the meaning of the final speech.

*Id.* at 2. Given that President Bush waived the § 2204(a)(5) restriction as to these categories of

records, NARA has an obligation to promptly produce any such records responsive to EPIC's

FOIA requests, subject to the applicable notice requirements of § 2208.

President Bush further instructed NARA that he would like to "consider whether to ease

restrictions in section 2204(a)(5) with respect to certain other categories," including "Confidential

communications on a national security or foreign policy topic," and he requested "NARA staff to

consult and seek guidance from [his] designated representative to determine whether to ease the

restriction criteria" for those other categories. *Id*. at 3. This creates a presumption that NARA

should disclose any such communications responsive to EPIC's FOIA requests, subject to the

guidance of President Bush's representative and the requirements of § 2208.

      EPIC is thus clearly entitled to the immediate processing and the prompt release of

requested records.

      **B.**      **EPIC and the public will suffer irreparable harm if relief is not granted.**

      If this Court does not order NARA to immediately process and issue a determination on

the FOIA requests, EPIC and its members will be irreparably harmed. There is strong evidence

that the documents EPIC seeks exist and that they would reveal information about Judge

Kavanaugh's involvement in surveillance programs that is of significant interest to the public.

This information, however, will have little value if it is released after the Senate votes on Judge

Kavanaugh's nomination, and the public has only a short time to weigh in before the vote. Any

further delay on NARA's processing will cause irreparable harm to both EPIC and the public.

      There is strong evidence that NARA is in possession of documents concerning Judge

Kavanaugh's involvement in surveillance programs that have not yet been made public. So far,

only his September 17, 2001, e-mail to John Yoo about warrantless surveillance and his drafts of

the Patriot Act talking points have been made public. The e-mail from Judge Kavanaugh to Mr.

Yoo, and the timing of their communication in connection with the development of President

Bush's warrantless wiretapping program, reveals that there are likely more communications

records detailing Judge Kavanaugh's involvement in warrantless wiretapping. Furthermore, when

Judge Kavanaugh was recently questioned as to whether he saw Mr. Yoo's memorandum or if he

had further communication with Mr. Yoo about the topic of his September 17, 2001, e-mail,

Judge Kavanaugh responded that he "cannot specifically recall" every memorandum he saw or

conversation he had while in the White House. The only way to find out what is contained in

Judge Kavanaugh's communications and other records is for NARA to process EPIC's FOIA

requests and make the records available to the public.

The Bush Library has released a (partial) list of folder titles for the textual records of

Judge Kavanaugh created during his tenure in the White House Counsel's Office and then the

White House Office of the Staff Secretary. *See* Ex. H; Ex. I; Nat'l Archives & Records Admin.,

*Records on Brett M. Kavanaugh* (last updated August 29, 2018).[31] Within Judge Kavanaugh's

Staff Secretary files there are likely to be records responsive to EPIC's FOIA requests and of

interest to the public. In particular, the Bush Library title list indicates that the agency has Judge

Kavanaugh's chronological folders associated with the following time periods during his tenure

as Staff Secretary: March 2004, October 2004, November 2004, December 2004, December 2005,

and January 2006. Ex. I at 7–8; 9–10; 11. The Bush Library title list also indicates that the agency

has Kavanaugh's speech file folders associated with at least nine of the President's relevant

speeches concerning warrantless wiretapping and the PATRIOT Act during the 2004-2006

period:[32]

- 04/19/2004 - Remarks on the USA Patriot Act [767553]
- 04/20/2004 - Conversation on the USA Patriot Act - Buffalo, New York [767548]
- 06/09/2005 - Remarks on the Patriot Act - Columbus, Ohio [770856]
- 12/17/2005 - Radio Address / Live Radio Address [767433]
- 12/19/2005 - Press Conference [767454]

---

[31] *Available at* https://www.georgewbushlibrary.smu.edu/Research/Digital-Library/BrettMKavanaughRecords.

[32] The American Presidency Project maintains a detailed list of and the text of President Bush's public papers, including speeches, announcements, press releases, and fact sheets. *See* Gerhard Peters & John T. Woolley, University of California Santa Barbara, *The American Presidency Project: Papers of George W. Bush* (2018), http://www.presidency.ucsb.edu/george_w_bush.php. According to the American Presidency Project, President Bush issued at least sixteen speeches, releases, or announcements concerning warrantless wiretapping or the Patriot Act during the December 2005 – March 2006 period. *Id*. Ex. I at 49–53.

- 01/04/2006 - Statement on the Global War on Terror [768429]
- 01/23/2006 - Talking Points on the Global War on Terror - Manhattan, Kansas [771840]
- 01/26/2006 - Opening Statement at Press Conference [771836]
- 03/09/2006 - Signing of H.R. 3199 - USA Patriot Improvement and Reauthorization Act [771803]

Ex. I at 26–52. The Bush Library title list also indicates that the agency has Kavanaugh's subject files for at least four personnel meetings that took place during the time periods indicated in EPIC's FOIA requests, as well as a folder for the "National Security Affairs Calendar":

- [Personnel Meeting - 03/02/2004]
- [Personnel Meeting - 03/16/2004]
- [Personnel Meeting - 12/21/2004]
- [Personnel Meeting - 01/06/2005]

Ex. I at 57–58. The Bush Library title list also indicates that the agency has Judge Kavanaugh's subject files from his White House Counsel's Office tenure that relate to "Anti-Terrorism Legislation" and "President's Emergency Powers." Ex. H at 1; 15. All of these folders contain textual records, responsive to EPIC's FOIA requests, that the public has a right to access prior to the Senate's vote on Judge Kavanaugh's nomination to the Supreme Court. There is also a strong presumption that these records should be made public pursuant to President Bush's directions to NARA on the handling of his Presidential Records. Ex. G, Bush Letter to Archivist.

The imminence of the Senate's votes on Judge Kavanaugh's nomination, and the almost complete loss in value of release of the records after the votes, presents just the sort of exigency Congress intended the expedited processing provision of the FOIA to be used for. As this Court has explained:

> [P]ublic awareness of the government's actions is "a structural necessity in a real democracy." Not only is public awareness a necessity, but so too is timely public awareness. For this reason, Congress recognized that delay in complying with FOIA requests is "tantamount to denial." The D.C. Circuit likewise acknowledged that "stale information is of little value."

*EPIC*, 416 F. Supp. 2d at 40 (internal citations omitted). NARA recognized the time sensitivity of EPIC's requests when it granted expedited processing. Because NARA has failed to process EPIC's requests in a timely manner, "[t]o afford the plaintiff less than expedited judicial review would all but guarantee that the plaintiff would not receive expedited agency review of its FOIA request." *Wash. Post*, 459 F. Supp. 2d at 66. Thus, failure to enforce EPIC's statutory right to expedited processing would result in irreparable harm. *See EPIC v. DOJ*, 416 F. Supp. 2d at 40-41 ("[T]he statutory right to expedition in certain cases underlined Congress' recognition of the value in hastening release of certain information . . . . [T]he loss of that value constitutes a cognizable harm. As time is necessarily of the essence in cases like this such harm will likely be irreparable.") (internal citations and quotation marks omitted).

If NARA refuses to process EPIC's FOIA requests until after the Senate votes on Judge Kavanaugh, it will also cause irreparable harm to EPIC's mission to educate the public about emerging privacy concerns. It is hard to imagine a more important privacy concern than the confirmation of a Supreme Court justice that may have played a significant role in developing and defending post-9/11 surveillance programs. Important privacy cases have regularly come before the Supreme Court over the last several years. *See, e.g., Carpenter v. United States*, 138 S. Ct. 2206 (2018); *Riley v. California*, 134 S. Ct. 2473 (2014); *United States v. Jones*, 565 U.S. 400 (2012). Thus, if confirmed, Kavanaugh would have substantial influence over the future development of the right to privacy. His surprising opinion in *Klayman v. Obama*, 805 F.3d 1148 (D.C. Cir. 2015) (Kavanaugh, J., concurring in the denial of rehearing en banc), where he stated that the "bulk collection of telephony data" is not a search and is "entirely consistent with the Fourth Amendment," is in tension with the Court's decision in *Carpenter*. *Id* at 1148-49. He has not revised his opinion in *Klayman* that the "special needs" of the government outweighed the

privacy concerns implicated, even though there was no evidence that the surveillance provided any national security benefit. If NARA does not release Kavanaugh's White House records relating to warrantless surveillance, EPIC will be deprived of the opportunity to educate Americans on how Judge Kavanaugh will affect the right to privacy on the Supreme Court.

Brett Kavanaugh's involvement in warrantless surveillance and his views on privacy have been of specific interest to the Senators on the Judiciary Committee as well as the public. Sens. Feinstein, Leahy, Durbin, Booker, Whitehouse, and Grassley, all asked Judge Kavanaugh about his involvement in the development and defense of warrantless wiretapping either during the confirmation hearings or in written queries after the hearings, and were especially concerned to hear his explanation of a September 17, 2018 e-mail to John Yoo about the Fourth Amendment implications of mass surveillance. CNN, *Read Brett Kavanaugh's Written Responses to the Senate Judiciary Committee* 236 (Sept. 12, 2018).[33] There has also been significant media coverage of Judge Kavanaugh's views regarding privacy protection. *See* Charlie Savage, *Kavanaugh Is Pressed on Knowledge of Bush-Era Disputes*, N.Y. Times (Sep. 5, 2018);[34] Dan Sewell, *Kavanaugh's support for surveilling Americans raises concerns*, Chicago Tribune (Aug. 27, 2018).[35]

Time is of the essence to engage in informed public debate about Judge Kavanaugh's nomination, and the public will be irreparably harmed by the continued withholding of responsive records. This Court has found irreparable harm, and granted a preliminary injunction, in similar situations where the requester seeks information urgently needed to inform public debate on a

---

[33] https://www.cnn.com/2018/09/12/politics/kavanaugh-written-responses-09-12/index.html.
[34] https://www.nytimes.com/2018/09/05/us/politics/kavanaugh-leahy-bush-disputes.html
[35] http://www.chicagotribune.com/news/nationworld/ct-kavanaugh-surveillance-americans-20180827-story.html.

pending issue of concern. As this court has recently said, "[d]istrict courts in this circuit have recognized that, where an obligation to disclose exists, plaintiffs may suffer irreparable harm if they are denied access to information that is highly relevant to an ongoing public debate." *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96, 110 (D.D.C. 2017); *Washington Post v. DHS,* 459 F. Supp. 2d 61, 75 (D.D.C. 2006) ("Because the urgency with which the plaintiff makes its FOIA request is predicated on a matter of current national debate, due to the impending election, a likelihood for irreparable harm exists if the plaintiff's FOIA request does not receive expedited treatment."); *EPIC v. DOJ*, 416 F. Supp. 2d at 41 (finding irreparable harm because plaintiff would be "precluded, absent a preliminary injunction, from obtaining in a timely fashion information vital to the current and ongoing debate surrounding the legality of the Administration's warrantless surveillance program").

The Senate's impending votes on a Supreme Court are arguably more urgent than the election issue before this court in *Wash. Post v. DHS*, as Presidents and members of Congress are elected to short, fixed terms, and are subject to public accountability in subsequent elections. There will be no further review of Kavanaugh's fitness for the Supreme Court after the Senate votes on his nomination. If he is confirmed, he will be a justice for life. Thus, the failure to process EPIC's FOIA requests immediately will be "tantamount to a denial." *Wash. Post*, 459 F. Supp. 2d at 74 (quoting H.R. Rep. No. 93-876, at 6 (1974)).

## C. The balance of the equities favors relief.

The balance of the equities favors entry of the preliminary injunction that EPIC seeks because no parties will be harmed by granting EPIC's order. NARA cannot claim to be burdened by a requirement to comply with its statutory obligations. NARA has already acknowledged that EPIC's requests are entitled to expedited processing, and thus can hardly claim to be burdened by an order granting an immediate determination. Further, NARA has agreed to process 1,000 pages

a week for another organization seeking documents related to Kavanaugh's nomination. *See* Ex. K. In addition, NARA processed and made public nearly 170,000 pages of material over a six-week period from the Clinton Presidential Library when Elena Kagan's nomination was before the Senate. AOTUS Blog, *Processing the Presidential Records of Elena Kagan*, The National Archives (June 22, 2010).[36] In addition, EPIC has already identified relevant textual folders in possession of the Bush Library**,** *see supra*, and have provided key terms and dates that can be used to search the e-mail records.

Neither will other FOIA requesters will be harmed if this Court orders NARA to make an immediate determination on EPIC's FOIA requests. The expedited processing provision envisions a system where some requests will be prioritized over others. In amending the FOIA to include the expedited processing provision, Congress recognized that there was "value in hastening release of certain information." *EPIC v. DOJ*, 416 F. Supp. 2d at 39. In granting EPIC expedited processing, NARA recognized that EPIC has demonstrated a "compelling need" for the information by showing an "urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II). Thus, prioritizing EPIC's request would simply be in keeping with the intent of the expedited processing provision.

### D.    The public interest favors the requested relief.

Granting EPIC's preliminary injunction would clearly be in the public interest. An agency's compliance with a mandatory statutory regime such as FOIA is "presumptively always in the public interest." *Protect Democracy Project v. DOD*, 263 F. Supp. 3d 293, 301 (D.D.C. 2017). In addition, the information EPIC seeks is essential for allowing the public to participate in a meaningful and informed debate over Judge Kavanaugh's nomination. His involvement the

---

[36] https://aotus.blogs.archives.gov/2010/06/22/processing-the- presidential-records-of-elena-kagan/.

development, expansion, and defense of post-9/11 surveillance programs is relevant to his fitness
for office and how he might rule as a justice on the Supreme Court. It is also in the public interest
that there be no further delay to the release of this information, as the Senate votes are imminent,
and there will be no further chance to affect Judge Kavanaugh's position on the Supreme Court
once he is confirmed.

In enacting the FOIA, Congress recognized that the continuation of our democracy
requires the public to be able to participate in debate over issues of national importance in an
informed and meaningful way. *Robbins*, 437 U.S. at 242 ("[t]he basic purpose of FOIA is to
ensure an informed citizenry, vital to the functioning of a democratic society, needed to check
against corruption and to hold the governors accountable to the governed.") But the public knows
little about the extent of Judge Kavanaugh's involvement in warrantless wiretapping, and the little
that has come to light—the Yoo e-mail, the Patriot Act talking points—have raised more
questions than answers. The records that EPIC seeks would answer these questions, and allow the
public to have an informed and meaningful debate over how Judge Kavanaugh's experience will
affect his decision making on privacy rights on the Supreme Court.

This Court has repeatedly recognized that information must be provided in a timely
fashion, or it is useless to enable public debate over an urgent issue of national importance. The
D.C. Circuit has rightly said, "[s]tale information is of little value." *Payne Enters., Inc. v. United
States*, 837 F.2d 486, 494 (D.C. Cir. 1988). The same is true here. The public has one opportunity
to weigh in on the fitness of a nominee to the Supreme Court, but only while the nomination is
pending. The public needs this information now—before it is too late.

## CONCLUSION

For the reasons stated above, this Court should grant EPIC's request for a preliminary injunction, and NARA should be compelled to make a determination on each of EPIC's FOIA requests concerning Judge Kavanaugh's White House records relating to warrantless surveillance.

Respectfully Submitted,

/s/ Marc Rotenberg
MARC ROTENBERG, D.C. Bar # 422825
EPIC President and Executive Director

ALAN BUTLER, D.C. Bar # 1012128
EPIC Senior Counsel

ELECTRONIC PRIVACY INFORMATION
CENTER
1718 Connecticut Avenue, N.W.
 Suite 200
Washington, D.C. 20009
(202) 483-1140 (telephone)
(202) 483-1248 (facsimile)

*Attorneys for Plaintiff EPIC*

Dated: September 20, 2018